**Kristy Lyn GAMACHE, by her mother and next friend, Madeline A. GAMACHE, Petitioner,**

v.

**SECRETARY OF the DEPARTMENT OF HEALTH AND HUMAN SERVICES, Respondent.**

**No. 90–2545V.**

United States Court of Federal Claims.

Jan. 26, 1993.

Michael R. Hugo, Boston, MA, for petitioner.

Alfonso J. Montano, with whom were Asst. Atty. Gen. Stuart M. Gerson, Helene M. Goldberg, Director, and John Lodge Euler, Deputy Director, Washington, DC, for respondent.

## OPINION

ANDEWELT, Judge.

In this action, petitioner, Madeline A. Gamache, seeks compensation under the National Childhood Vaccine Compensation Act

of 1986, 42 U.S.C. §§ 300aa–10 to –34 (the Vaccine Act), for injuries her daughter, Kristy Lyn Gamache (Kristy), allegedly suffered as a result of a DPT (diphtheria, pertussis, and tetanus) vaccination administered on October 10, 1980, when Kristy was four months old. After conducting a hearing, the special master assigned to the petition issued a decision on July 16, 1992, dismissing the petition with prejudice. On August 13, 1992, petitioner filed a motion in this court pursuant to 42 U.S.C. § 300aa–12(e)(1) seeking review of the special master's decision. On January 22, 1993, this court issued an order affirming the special master's dismissal of the petition. The instant opinion explains the court's reasoning for that affirmance.

## I.

The petition alleges alternative grounds for obtaining compensation under the Act. The first two grounds are based on the Vaccine Injury Table, 42 U.S.C. § 300aa–14(a). The Vaccine Injury Table lists a series of illnesses, disabilities, injuries, and conditions (hereinafter conditions) and specifies a particular time period for the onset of each condition. Under the Vaccine Act, if a petitioner demonstrates by a preponderance of the evidence that he or she suffered a condition listed in the Vaccine Injury Table, and that the first symptom or manifestation of the onset of that condition occurred within the specified statutory time period, the petitioner is entitled to compensation, unless the respondent demonstrates by a preponderance of the evidence that the condition was caused by factors unrelated to the vaccination. 42 U.S.C. §§ 300aa–11(c)(1)(C)(i) and 300aa–13(a)(1). The instant petition alleges that Kristy currently suffers from both an encephalopathy and a residual seizure disorder, both of which are conditions listed in the Vaccine Injury Table, and that the first manifestations of these conditions occurred within the three-day statutory time period. 42 U.S.C. § 300aa–14(a)(I)(B) and (D).

The Vaccine Act also grants compensation for conditions listed in the Vaccine Injury Table if, regardless of the timing of the onset of the symptoms, a petitioner can demonstrate by a preponderance of the evidence that the vaccine caused the condition. 42 U.S.C. §§ 300aa–11(c)(1)(C)(ii)(II) and 13(a)(1). As a third and alternative ground for compensation, petitioner alleges that the DPT immunization Kristy received on October 10, 1980, was the cause in fact of both Kristy's encephalopathy and residual seizure disorder.

On March 30, 1992, the special master conducted a hearing. The evidence submitted during that hearing included Kristy's medical records, a baby book kept by petitioner, affidavits by and oral testimony of petitioner and petitioner's sister, Margaret DePasquale, an affidavit by Kristy's pediatrician, Dr. John Cummings, and the oral testimony of two medical experts, Dr. Paul A. Carpentier for petitioner and Dr. Max Wiznitzer for respondent. At the hearing, respondent did not dispute that Kristy then suffered from both an encephalopathy and a residual seizure disorder. The dispute between the parties involved whether Kristy manifested the first symptoms of these conditions within the three-day statutory time period and whether these conditions were caused in fact by the October 10, 1980, DPT vaccination.

In her July 16, 1992, decision, the special master dismissed the petition and concluded that petitioner "has failed to satisfy her burden of proving an on-Table onset of Kristy's medical condition" and "has not proved causation in fact." In a December 2, 1992, order, this court remanded this action to the special master for further clarification of certain points of her decision. On December 16, 1992, the special master issued a decision on remand which reaffirms her prior dismissal of the petition and presents additional explanation.

## II.

In both her July 16 and December 16, 1992, decisions, the special master describes the pertinent testimony and evidence in detail. There is no significant dispute as to the physical symptoms Kristy exhibited either prior to or after the October 10, 1980, vaccination. With respect to

Kristy's symptoms within the three-day period following the DPT vaccination, the special master summarized petitioner's testimony as follows:

> Mrs. Gamache gave [Kristy] two aspirins after the vaccination and she was fine. Kristy took a nap in the afternoon. That night, she started screaming and Mrs. Gamache thought it was gas. She took Kristy into her bedroom. Kristy was thrashing and continually screaming. The injection site was swollen and red. Her cry was not normal; it was high-pitched. Her hands were tense and going back and forth. Kristy felt warm, but Mrs. Gamache did not take her temperature. Kristy would not take a bottle and was not interested in anything around her.
>
> The screaming lasted a good part of the night. Sometimes Kristy would stop, relax, and close her eyes. This lasted three to five minutes. Her screaming ended at 4:00 or 5:00 a.m.
>
> \*   \*   \*   \*   \*   \*
>
> Kristy slept most of the day, October 11, 1980. Mrs. Gamache woke her after lunch. She had not taken a bottle during the prior night. Kristy ate some and was very quiet. She slept the next day. Mrs. Gamache stated that after the second day post vaccination, Kristy did not appear sick any more.

*Gamache v. Secretary, HHS*, No. 90–2545V, slip op. at 7–8, 1992 WL 185709 (Cl.Ct. July 16, 1992) (citations omitted).

As to the period beyond the three days after administration of the vaccination, the special master found that Kristy lacked physical and mental progression. In addition, the special master found that Kristy first manifested staring episodes in late October 1980, weeks after the DPT inoculation, and first exhibited seizures in conjunction with bodily shaking in February 1982.

Because there was no significant dispute as to Kristy's physical symptoms prior to or after vaccine administration,[1] the central issue before the special master was the appropriate medical significance to draw from these symptoms. The two testifying medical experts both agreed that Kristy suffers from a residual seizure disorder and some type of encephalopathy. Beyond this diagnosis, however, the experts agreed on very little. Each expert painted a conflicting diagnosis of when the first manifestation of the onset of these conditions occurred, and whether the conditions were caused in fact by the DPT immunization.

Petitioner's expert, Dr. Carpentier, who is board certified in family practice medicine, concluded that the DPT vaccination was the cause in fact of Kristy's encephalopathy and residual seizure disorder and, in addition, that the first manifestation of both of these conditions occurred within three days after the vaccination. *Inter alia*, Dr. Carpentier testified that the vaccine produced a change in Kristy's level of consciousness, feeding tendencies, and response to her environment. He classified her relaxing between screaming episodes as "atypical absence seizures."[2] He also testified that after the vaccination, Kristy experienced significant changes in her development, including the growth of her head, and that she did not maintain her developmental milestones. Dr. Carpentier acknowledged, however, that (1) the medical records alone would not indicate an encephalopathy or a residual seizure disorder within three days after the vaccination, (2) Kristy's high-pitched crying could have been the result of pain at the injection site and was not itself sufficient to support the

---

1. There is an arguable discrepancy between petitioner's affidavits and her oral testimony concerning when Kristy first manifested staring episodes. The affidavits suggest that staring commenced during the three-day period after the vaccination. However, petitioner testified during the March 30, 1992, hearing before the special master that Kristy's staring episodes first occurred in late October 1982. In her July 16, 1992, decision, the special master made a finding consistent with petitioner's oral testimony.

2. Although Dr. Carpentier testified that Kristy's staring episodes resembled "atypical absence seizures," in making this diagnosis, he relied on evidence indicating that Kristy began staring within three days after the administration of the vaccination. As explained in note 1 *supra*, the special master found that Kristy first manifested staring episodes weeks after the DPT vaccination.

diagnosis of an encephalopathy, and (3) a neurologist would be better qualified than he to diagnose a seizure disorder. Dr. Carpentier also testified that he uses pediatricians and neurologists as referrals, has personally never diagnosed encephalopathy in any of his patients, and has diagnosed a seizure disorder only once.

Respondent's expert, Dr. Wiznitzer, is board certified both in pediatrics and neurology with a special competence in child neurology. Dr. Wiznitzer testified that Kristy's medical conditions were prenatal in origin rather than DPT-induced. Dr. Wiznitzer classified Kristy's reaction to the vaccination during the three days after administration as "a relatively intense local reaction to the DPT," which he testified is a common reaction to such vaccinations. Dr. Wiznitzer explained that if Kristy had suffered "a post-natal insult," as Dr. Carpentier alleged, Kristy would have been stuporous for days, would have required hospitalization, and her CAT scan, which was normal, would have been abnormal.[3]

### III.

The special master's December 16, 1992, decision provides an in-depth explanation of her rationale for dismissing the petition. Therein, the special master resolves the conflicting testimony of the parties' experts and determines that with respect to the relevant medical issues, respondent's expert, Dr. Wiznitzer, is better experienced, is more credible, and demonstrated sounder medical reasoning than Dr. Carpentier. In evaluating whether Kristy experienced the first manifestation of encephalopathy within three days after the DPT vaccination, the special master focused on the description of encephalopathy contained in 42 U.S.C. § 300aa–14(b), entitled "Qualifications and aids to interpretation." The special master found that "the only evidence of encephalopathy under the aids to interpretation of the Vaccine Act

was prolonged screaming and inconsolable crying." *Gamache v. Secretary, HHS*, No. 90–2545V, slip op. at 4, 1992 WL 394274 (Ct.Fed.Cl. Dec. 16, 1992) (*Gamache II*). Relying on the statute's wording and Dr. Wiznitzer's testimony, the special master rejected this evidence as insufficient and concluded: "Under the statute, screaming and crying in and of themselves are not conclusive evidence of encephalopathy. Kristy's high-pitched and unusual screaming and inconsolable crying are explainable as a local, systemic reaction to the DPT vaccine rather than as indicia of encephalopathy." *Id.* at 3 (citation omitted).

Turning next to the issue of when Kristy first manifested her residual seizure disorder, the special master again based her analysis on the applicable definitions contained in 42 U.S.C. § 300aa–14(b). The special master evaluated the pertinent evidence and ultimately concluded that "[u]nder the statute's terms, Kristy does not satisfy the requirements of a residual seizure disorder." *Gamache II*, slip op. at 7. The special master found that "Kristy's medical records indicate that she suffered her first seizure in February 1982, sixteen months after her DPT vaccination." *Id.* at 6. The special master rejected Dr. Carpentier's testimony that Kristy's relaxing between screaming episodes during the first two days after the DPT inoculation constituted a manifestation of a residual seizure disorder. The special master instead relied on Dr. Wiznitzer's testimony that the relaxation periods were not symptomatic of a seizure, but rather were the result of fatigue because the pain from the injection site had kept Kristy awake and screaming. The special master stated:

> The court finds Dr. Wiznitzer's opinion more credible than Dr. Carpentier's because of both Dr. Wiznitzer's extensive experience as a pediatric neurologist and his thorough medical reasoning. Dr. Carpentier appears to be speculating in

---

**3.** As to the staring episodes, Dr. Wiznitzer testified that absence seizures "purely by themselves, just pure staring spells ... are not a seizure-type that we see as part of an acute reaction to [a DPT vaccination]." The staring normally would be accompanied by rhythmic jerking or tonic posturing of an extremity. Dr. Wiznitzer also testified that generalized absence seizures, or petit mal seizures, are unheard of in a child under one year of age, are genetically based, and usually disappear by adulthood.

an area in which he has marginal experience for the purpose of trying to fit Mrs. Gamache's testimony (which is not substantiated by any of the medical records) into the statute's requirements for a residual seizure disorder.

*Id.* at 7.

The special master similarly concluded that petitioner did not satisfy her burden to prove causation in fact. The special master rejected as insufficient Dr. Carpentier's testimony that the DPT vaccination caused Kristy's encephalopathy which in turn caused her residual seizure disorder. The special master concluded: "Dr. Carpentier's failure to describe the medical or scientific basis for his conclusion of causation in fact is fatal to petitioner's satisfaction of her burden." *Id.* at 9.[4] Relying on Dr. Wiznitzer's opinion that there is no reason to believe that the vaccination caused Kristy's medical condition, the special master went on to find "that the DPT vaccine did not in fact cause Kristy's encephalopathy." *Id.* at 10.

## IV.

■■■ Under the provisions of the Vaccine Act, the Court of Federal Claims may set aside a special master's findings of fact or conclusions of law only if the court determines them "to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 42 U.S.C. § 300aa–12(e)(2)(B). Under this standard, this court generally will affirm a decision of a special master if the court finds that the special master considered the relevant evidence of record, drew plausible inferences, and articulated a rational basis for his or her decision. *Hines v. Secretary, HHS,* 940 F.2d 1518, 1527–28 (Fed.Cir.1991).

■■■ Petitioner contends that the court should set aside the special master's finding that petitioner has failed to demonstrate the first manifestation of an encephalopathy within three days after the DPT vaccination on the ground that the

special master improperly relied upon a medical article written by Dr. Gerald M. Fenichel, M.D. The special master cites and applies that article in her July 16, 1992, decision as follows:

A local reaction to a DPT immunization, even including fussiness, fever, redness, swelling, and crying hardly qualifies as a seizure or as any type of neurological sequela to the vaccination. According to Dr. Gerald M. Fenichel, M.D.:

> An accepted sequence of events for the diagnosis of pertussis vaccine encephalopathy is the onset of *prolonged, generalized tonic-clonic seizures and states of decreased consciousness* within seventy-two hours of immunization.

G.M. Fenichel, *Clinical Pediatric Neurology, A Signs and Symptoms Approach* 57 (1988) (emphasis added).

Nothing in the medical records of this case, in Dr. Cummings' affidavit or in Kristy's baby book substantiates that Kristy suffered prolonged, generalized tonic-clonic seizures and states of decreased consciousness. On the other hand, a common reaction to the DPT immunization is fussiness, fever, redness, swelling, and crying:

> A number of adverse reactions have been associated with pertussis immunization. Transient *local and systemic reactions are common* and include *redness* (7 percent), *swelling* (9 percent), and *pain* at the injection cite; *fever* to 38°C or greater (47 percent) and vomiting. These reactions occur within a few hours of vaccination, are transient, and tend to increase in frequency with subsequent doses of vaccine. [Emphasis added.]

1 *Harrison's Principles of Internal Medicine* 622 (12th ed. 1991).

That Kristy suffered fussiness, fever, redness, swelling and crying is consistent with transient local and systemic reac-

---

**4.** With respect to causation of a residual seizure disorder, the special master concluded that "it makes no difference if Dr. Carpentier thinks that Kristy's encephalopathy caused her seizure disorder because petitioner has failed to provide the causative link between DPT vaccine and encephalopathy." *Id.* at 10.

tions. It does not establish a seizure disorder.

*Gamache,* slip op. at 16–17.

Petitioner asserts that the special master erred by requiring the petitioner to show the "accepted sequence of events" for the diagnosis of pertussis vaccine encephalopathy set forth in the *Fenichel* article (*i.e.,* "prolonged, generalized tonic-clonic seizures and states of decreased consciousness") rather than applying the more permissive diagnosis criteria described in the "Qualifications and aids to interpretation" set forth in the Vaccine Act, 42 U.S.C. § 300aa–14(b)(3)(A).[5]

This court's December 2, 1992, remand order was the result of the court's concern that the above quoted language in the special master's July 16, 1992, decision was ambiguous in that it was not clear whether the special master had relied upon the *Fenichel* article in lieu of the diagnosis criteria set forth in Section 300aa–14(b)(3)(A), or rather simply cited the article to support further her application of the statutory diagnosis criteria. To resolve this ambiguity, *this court remanded the petition to the special master.*

In her subsequent decision on remand, the special master explained that the *Fenichel* article was not a "lynch pin" of her analysis and proceeded to provide a more extensive description of her analysis. That description makes clear that the special master did not view Fenichel's "accepted sequence of events" as a requirement for demonstrating the onset of an encephalopathy, and instead properly based her analysis on the diagnostic criteria contained in Section 300aa–14(b)(3)(A). As explained above, the special master reviewed the evidence as to each manifestation, sign, and symptom of encephalopathy listed in Section 300aa–14(b)(3)(A) and found no evidence that during the critical three-day post-vaccination period Kristy manifested any of these statutory indicia other than high-pitched screaming and crying.[6] However, Section 300aa–14(b)(3)(A) specifies that high-pitched screaming and inconsolable crying, while compatible with encephalopathy, "in and of themselves are not conclusive evidence of encephalopathy." Moreover, Dr. Wiznitzer expressed the opinion that Kristy's screaming and crying resulted from pain at the injection site rather than an encephalopathy. Given this evidence, the special master did not commit reversible error when she concluded that petitioner has not satisfied her burden to prove by a preponderance of the evidence that the first manifestation of encephalopathy occurred within three days after the vaccination.[7]

---

5. Section 300aa–14(b)(3)(A) defines encephalopathy as follows:

> The term "encephalopathy" means any significant acquired abnormality of, or injury to, or impairment of function of the brain. Among the frequent manifestations of encephalopathy are focal and diffuse neurologic signs, increased intracranial pressure, or changes lasting at least 6 hours in level of consciousness, with or without convulsions. The neurological signs and symptoms of encephalopathy may be temporary with complete recovery, or may result in various degrees of permanent impairment. Signs and symptoms such as high pitched and unusual screaming, persistent unconsolable crying, and bulging fontanel are compatible with an encephalopathy, but in and of themselves are not conclusive evidence of encephalopathy. Encephalopathy usually can be documented by slow wave activity on an electroencephalogram.

6. In petitioner's response to the special master's remand decision, petitioner argues that Dr. Carpentier also testified that Kristy exhibited other symptoms of encephalopathy such as loss of interest in surroundings, loss of previously acquired skills, and a decrease in head circumference. However, the evidence does not indicate that these additional symptoms occurred within the critical three-day period after administration of the vaccination, or that a causal connection exists between the DPT vaccine and the encephalopathy.

7. Petitioner also contends that the special master erred by failing during the course of the hearing to provide petitioner with an opportunity to challenge the *Fenichel* article. In *Hines,* 940 F.2d at 1525–26, the Court of Appeals for the Federal Circuit evaluated the special master's obligation to provide such an opportunity to challenge a medical text cited in the special master's opinion. The court concluded that pursuant to Rule 8(b) of Appendix J, Rules of the Court of Federal Claims, the special master's consideration of evidence is "governed by principles of fundamental fairness to both parties." Here, for the reasons set forth above, the special master's analysis focuses on the criteria set

## V.

Next, petitioner contends that the special master applied the wrong standard in evaluating the evidence. Petitioner argues that, under the Vaccine Act, because Dr. Carpentier testified that the DPT vaccination caused Kristy's encephalopathy and residual seizure disorder and that Kristy manifested the onset of these conditions within the critical three-day statutory time period, the burden shifted to respondent to prove that Kristy's condition was caused by factors unrelated to the DPT vaccination. Because the special master did not find that respondent had proved any alternative cause, petitioner asserts that the special master was obliged to rule in petitioner's favor on compensation. But this argument misreads the burden-shifting provision in Section 300aa–13(a)(1) and misunderstands the special master's decision.

Pursuant to Section 300aa–13(a)(1), the special master must make the determination "on the record as a whole" as to whether the petitioner has established the pertinent matters by a preponderance of the evidence. Thus, in deciding whether petitioner established by a preponderance of the evidence either that the DPT vaccination caused Kristy's medical conditions or that the first manifestation of these conditions occurred within the three-day statutory time period, the special master could not limit the review of the record to Dr. Carpentier's testimony. Rather, the special master was obliged to consider and weigh all of the evidence in the record, including Dr. Wiznitzer's conflicting testimony.

The special master performed such an analysis "on the record as a whole" and concluded that Dr. Wiznitzer's medical opinion, which did not support compensation under the Vaccine Act, was more credible than Dr. Carpentier's.[8] The special master's reliance on Dr. Wiznitzer's testimony certainly does not constitute reversible error. "Determining the weight and credibility of the evidence is the special province of the trier of fact." *Inwood Laboratories, Inc. v. Ives Laboratories, Inc.*, 456 U.S. 844, 856, 102 S.Ct. 2182, 2189, 72 L.Ed.2d 606 (1982). Moreover, here, Dr. Wiznitzer clearly had more experience in the relevant medical areas than Dr. Carpentier.

Thus, the special master applied the correct standard in evaluating the evidence in the record. Because petitioner never established the pertinent matters by a preponderance of the evidence, the burden never shifted to respondent to establish any alternative cause of Kristy's encephalopathy and residual seizure disorder.

### Conclusion

For the reasons set forth above, this court affirms the special master's July 16, 1992, decision dismissing the petition with prejudice. As set forth in this court's January 22, 1993, order, the Clerk of the Court is directed to enter judgment accordingly.

IT IS SO ORDERED.

---

forth in Section 300aa–14(b)(3)(A), and the *Fenichel* article is not critical to that analysis. Given the limited function the article serves in the special master's analysis as explained on remand, the court cannot conclude that the special master committed reversible error when she cited the article, or that any pertinent finding of fact or conclusion of law in that decision is rendered suspect by that citation.

**8.** On the issue of causation, as described above, the special master concluded that Dr. Carpentier's testimony, even when viewed in isolation, was insufficient to support a finding of causation. This conclusion does not constitute reversible error. Dr. Carpentier failed to describe any medical mechanism by which the DPT vaccination could have caused Kristy's encephalopathy and, in addition, failed to present any other scientific data, such as statistical evidence, which could support a finding that the encephalopathy was caused by the vaccine. *See e.g., Hasler v. United States*, 718 F.2d 202, 205 (6th Cir.1983), *cert. denied*, 469 U.S. 817, 105 S.Ct. 84, 83 L.Ed.2d 31 (1984) (to show that a vaccine was the cause in fact of an injury, a party must show that the injury was the natural and probable result of the vaccine).