Donnella RASPBERRY, personal representative of the estate of Shanelle Eastling, deceased, Petitioner,

v.

SECRETARY OF the DEPARTMENT OF HEALTH AND HUMAN SERVICES, Respondent.

No. 91–1567V.

United States Court of Federal Claims.

May 2, 1995.

Joseph C. Smith, Detroit, MI, for petitioner.

Richard A. Schollmann, with whom were Asst. Atty. Gen. Frank W. Hunger, Helene M. Goldberg, Director, and Gerard W. Fischer, Asst. Director, Washington, DC, for respondent.

*OPINION*

ANDEWELT, Judge.

I.

In this action, petitioner, Donnella Raspberry, seeks compensation under the National Childhood Vaccine Injury Act of 1986, 42 U.S.C. §§ 300aa–1 to –34 (the Vaccine Act), for the death of her daughter, Shanelle Eastling. Petitioner contends that Shanelle's death was caused by a DPT (diphtheria, pertussis, and tetanus) vaccination administered on August 20, 1990. On the morning of August 22, 1990, less than two days after Shanelle received the vaccination, petitioner found Shanelle dead in bed. During this brief period following the vaccination and prior to her death, Shanelle ate less than usual, was lethargic and irritable, and cried excessively. The medical examiner, Dr. Ronald Graeser, who performed the autopsy, listed myocarditis (inflammation of the muscle tissue of the heart) as the cause of death and viremia (the presence of a virus in the blood) as the underlying cause of the myocarditis.

Petitioner presents three alternative theories to support her entitlement to compensation. First, petitioner contends that she is entitled to compensation because Shanelle suffered a hypotonic-hyporesponsive collapse (HHC), a condition listed in the Vaccine Injury Table, 42 U.S.C. § 300aa–14, and she experienced the first symptom or manifestation of the onset of that condition within the three-day time period set forth in the Vaccine Injury Table. Second, petitioner contends that she is entitled to compensation

pursuant to Sections 300aa–11(c)(1)(C)(ii) and –13(a)(1) because the administration of the vaccine was the cause in fact of Shanelle's death. Third, petitioner contends that even if she did not demonstrate causation, she nevertheless is entitled to compensation as a sanction because respondent's representatives lost the only remaining tissue samples and slides of Shanelle's heart and thereby impaired petitioner's ability to prove causation.

■ In a February 3, 1994, decision, the special master denied compensation on all three theories. Petitioner filed a motion in this court pursuant to 42 U.S.C. § 300aa–12(e)(1) seeking review of that decision. This court may set aside a special master's findings of fact or conclusions of law only if the court determines that the findings or conclusions are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 42 U.S.C. § 300aa–12(e)(2)(B). Under this standard, this court generally will affirm a special master's decision if the court determines that the special master considered the relevant evidence of record, drew plausible inferences, and articulated a rational basis for his or her decision. *Hines v. Secretary, HHS*, 940 F.2d 1518, 1527–28 (Fed.Cir.1991). For the reasons set forth below, the court affirms the special master's decision.

## II.

### A.

The Vaccine Injury Table identifies certain vaccines and for each identified vaccine, specifies certain illnesses, disabilities, injuries, or conditions (hereinafter Table Injuries) that have been associated with the administration of that vaccine. For each such specified Table Injury, Section 300aa–14(a) states a time period within which the first symptom or manifestation of the Table Injury must occur. If a petitioner demonstrates by a preponderance of the evidence that a vaccine recipient suffered a Table Injury and that the first symptom or manifestation of the onset of that injury occurred within the specified statutory time period after vaccine administration, then the vaccine is presumed to have caused the injury. 42 U.S.C. §§ 300aa–11(c)(1)(C)(i) and –13(a)(1)(A). If a petitioner makes such a showing and satisfies the other statutory requirements,[1] then the petitioner is entitled to compensation unless there is a preponderance of the evidence that the injury "is due to factors unrelated to the administration of the vaccine." 42 U.S.C. § 300aa–13(a)(1)(B).

At a hearing before the special master, petitioner's medical experts, Drs. Werner Spitz and George Sprecace, testified that Shanelle manifested an HHC and respondent's experts, Drs. Ronald Graeser, Marie Valdes–Dapena, and Richard Rapkin, disagreed. In his decision, the special master discussed the experts' respective opinions and ultimately resolved the battle of the experts in favor of respondent. The special master concluded that respondent's experts were "quite convincing" and that petitioner's experts were "extremely unpersuasive," "not logically persuasive," and "not giving ... candid, honest opinions."

### B.

■ In her motion for review, petitioner contends that the special master acted arbitrarily and capriciously when he relied upon respondent's experts and concluded that Shanelle did not suffer from an HHC. Petitioner argues that the symptoms Shanelle exhibited are many of the same symptoms that the court in *Hellebrand v. Secretary, HHS*, 24 Cl.Ct 756 (1991), *rev'd*, 999 F.2d 1565 (Fed. Cir.1993), characterized as symptoms of an HHC. But petitioner simply places too much weight on the individual symptoms that Shanelle exhibited, such as lethargy, during the post-vaccine period. Proof that Shanelle experienced certain symptoms that are commonly experienced by patients who suffer from an HHC does not necessarily mean that

---

1. Pursuant to Section 300aa–11(c), a petitioner must also demonstrate, *inter alia*, that the vaccine recipient (1) suffered the injury for at least six months and incurred unreimbursable medical expenses related to that injury in excess of $1,000 or died from the administration of the vaccine, and (2) received no award or settlement for the vaccine-related injury. 42 U.S.C. §§ 300aa–11(c)(1)(D) and –11(c)(1)(E).

Shanelle experienced an HHC. Particular medical symptoms frequently can indicate a variety of medical conditions. Determining the correct diagnosis from a symptom or set of symptoms is a medical issue that requires a diagnostician to consider all of the medical evidence and draw upon his or her experience and expertise. In reversing the *Hellebrand* decision, the Court of Appeals for the Federal Circuit stressed that even proof that a vaccine recipient exhibited the symptoms of an HHC specifically set forth in the Vaccine Act's aids to interpretation, 42 U.S.C. § 300aa–14(b)(1), does not "automatically ... serve to establish the presence of [an HHC]." 999 F.2d at 1570. In the instant case, the special master based his conclusion that the symptoms Shanelle exhibited did not demonstrate an HHC upon testimony to that effect by respondent's medical experts.

Petitioner argues that the evidence contradicts the special master's finding that respondent's medical experts were more credible. Petitioner focuses her attack primarily upon the testimony of Dr. Rapkin. Petitioner complains that Dr. Rapkin never personally witnessed an HHC, that he based aspects of his testimony concerning symptoms of an HHC upon articles that were not entered into evidence, and that his testimony was inconsistent with a certain article written by Dr. James Cherry, a physician upon whose articles Dr. Rapkin relied in his testimony. Dr. Rapkin, however, was a qualified medical expert and explained in detail the medical basis for his opinions. As to aspects of his opinions that may be inconsistent with the article by Dr. Cherry, Dr. Rapkin explained that his testimony was consistent with another article by Dr. Cherry as well as other medical authorities, not in evidence, on which he relied. The Federal Rules of Evidence permit experts to base their opinions on authorities that are not offered into evidence. *See* Fed.R.Evid. 703 ("If of a type reasonably relied upon by experts ..., the facts or data need not be admissible in evidence").

Faced with conflicting expert testimony, the special master assessed the experts' relative credibility. "Determining the weight and credibility of the evidence is the special province of the trier of fact." *Inwood Labo-* *ratories, Inc. v. Ives Laboratories, Inc.,* 456 U.S. 844, 856, 102 S.Ct. 2182, 2189, 72 L.Ed.2d 606 (1982); *see Gamache v. Secretary, HHS,* 27 Fed.Cl. 639, 645 (1993). The trier of fact is in the best position to make such determinations because he or she has the unique opportunity to observe the witnesses and assess their demeanor. *See Hambsch v. Dep't of Treasury,* 796 F.2d 430, 436 (Fed.Cir.1986) ("[c]redibility determinations ... are virtually unreviewable"). In his decision, the special master discussed the pertinent expert testimony and explained in adequate detail his rationale for relying upon respondent's experts' opinions as to whether Shanelle had experienced an HHC. This court finds the special master's explanation to be reasonable and hence, the court must affirm the special master's conclusion.

### III.

Next, petitioner asserts that the DPT vaccination was the cause in fact of Shanelle's death. To prevail on an allegation of causation under Section 300aa–11(c)(1)(C)(ii), a petitioner must demonstrate by a preponderance of the evidence that the vaccination actually caused the child's injury. 42 U.S.C. § 300aa–13(a)(1). The petitioner generally must present "a logical sequence of cause and effect showing that the vaccination was the reason for the injury." *Knudsen v. Secretary, HHS,* 35 F.3d 543, 548 (Fed.Cir. 1994). This "logical sequence of cause and effect must be supported by a sound and reliable medical or scientific explanation." *Id.*

Here, the special master evaluated the evidence presented and concluded that "the evidence of record leaves little doubt that the cause of Shanelle's death was myocarditis." *Raspberry v. Secretary, HHS,* No. 91–1567V, slip op. at 6 (Fed.Cl. Feb. 3, 1994). The special master then concluded that the preponderance of the evidence indicates that a virus, not the DPT vaccination, caused Shanelle's myocarditis. On this issue, the special master once again had to evaluate conflicting expert testimony. Respondent's medical experts attributed Shanelle's myocarditis to a virus and petitioner's medical experts pointed to endotoxins found in the DPT vaccination.

In making his determination, the special master relied in part on the results of Dr. Graeser's autopsy, in which Dr. Graeser concluded that Shanelle's myocarditis resulted from a virus. Dr. Graeser noted that the autopsy report showed lymphocytic infiltration of not only Shanelle's myocardium, but also her kidneys. With respect to the autopsy, the special master stated:

> One important point is that while the opinions of Drs. Spitz, Sprecace, Rapkin, and Dapena were all solicited solely for the purpose of this litigation, Dr. Graeser first expressed his opinion on this issue at the time of the autopsy, with no incentive to conclude one way or another. It is significant that at that time he was convinced enough of the viral origin of the myocarditis to so indicate in his autopsy report and the death certificate.

> Further, as to the issue of whether the results of the autopsy examination of Shanelle's kidney indicated unusual lymphocytic infiltration, I simply found Dr. Graeser more persuasive than Dr. Spitz, based on the fact that he did the autopsy himself and on the fact that I found his testimony more candid that of Dr. Spitz.

*Id.* at 7–8. The special master framed his ultimate conclusion as to petitioner's failure to meet her burden to prove causation, as follows:

> In sum, the evidence is overwhelming that viruses cause the large majority of cases of myocarditis, commonly including sudden unexpected deaths not preceded by clinical symptoms. There is also specific autopsy evidence here, though less than overwhelming, of viral presence in Shanelle. On the other hand, there exists in the record no substantial evidence that the DPT vaccination can cause, or ever has caused, myocarditis sufficient to cause death. In these circumstances, I find it quite clear that petitioner has *failed* to demonstrate that Shanelle's myocarditis, or her death, were "more probably than not" caused by her DPT inoculation.

*Id.* at 9. The special master rejected petitioner's contention that the short period of time between the DPT administration and Shanelle's death supported petitioner's theory of causation, noting that viral myocarditis can have a rapid onset.[2]

Petitioner contends that the special master erroneously relied upon Dr. Graeser's autopsy. Petitioner argues that a proper diagnosis of viremia can be made only by identifying the specific viral agent and Dr. Graeser never identified such a viral agent. At the time of the autopsy, however, there apparently was no compelling reason, medical or otherwise, for Dr. Graeser to determine the particular virus that caused Shanelle's myocarditis. Dr. Graeser based his conclusion that a virus caused Shanelle's condition on the medical evidence that was then available to him, including lymphophatic infiltration of Shanelle's kidneys.

In any event, even assuming that respondent did not prove that a virus caused Shanelle's myocarditis, petitioner still could not prevail in her causation-in-fact claim. Sections 300aa–11(c)(1)(C)(ii) and –13(a)(1) do not require respondent to prove an alternative cause, but rather place the burden on petitioner to prove that the DPT vaccine actually caused Shanelle's death. The special master analyzed petitioner's evidence supporting a potential link between DPT endotoxins and myocarditis and concluded that the evidence in the record did not sufficiently demonstrate that the DPT vaccination caused Shanelle's death. The special master explained:

> [T]he evidence that myocarditis *can even be caused by a DPT vaccination* is so scant as to be negligible. While all the experts in this case acknowledged that toxic shock can cause myocarditis, all the evidence indicated that this would be an extremely rare event. Moreover, *no* substantial evidence pointed to a DPT inoculation as a potential source of such toxic shock. In this regard, I note initially that the best evidence in the record here concerning the issue of possible causes of

---

**2.** Although petitioner correctly notes that one of respondent's experts, Dr. Dapena, indicated that the evidence did not support a diagnosis of vire- mia, Dr. Dapena did concur with the conclusion that a virus, more probably than not, caused Shanelle's myocarditis.

myocarditis in children is a chart taken from an authoritative medical text, giving an exhaustive list of known causes. Under the heading of "toxic" causes, two possibilities only are mentioned—causation by a scorpion sting or diphtheria. And Dr. Rapkin explained, without rebuttal, that the mention of diphtheria in that list referred to exposure to the diphtheria *toxin,* which, Dr. Rapkin explained, is not contained in the diphtheria *toxoid* which is part of the DPT inoculation. Thus, on this exhaustive list of known causes, neither the DPT inoculation nor any component thereof appears. Therefore, it would appear that the possibility of myocarditis as a result of any toxic event other than the two listed, while not theoretically impossible, is speculative at best.

*Raspberry,* slip op. at 8 (citation and footnote omitted).

The special master considered the relevant evidence and offered a reasoned explanation to support his conclusion that petitioner failed to prove, by a preponderance of the evidence, that the DPT vaccination caused Shanelle's death. Hence, the court must affirm that decision.

### IV.

■ Finally, petitioner contends that she is entitled to compensation on the ground that respondent negligently lost the slides containing the only remaining tissue from Shanelle's heart. After an evidentiary hearing, the special master agreed that respondent had acted negligently, but denied the compensation request, *inter alia,* on the ground that petitioner had failed to "demonstrate any substantial prejudice from the loss of the autopsy slides." The special master explained:

Ultimately, what is important is ... the complete lack in the record before me of any credible evidence that any test of the slide of Shanelle's heart tissue could have proved that diphtheria toxin had invaded her heart. (Of course, testing might have *ruled out* certain viruses, but even that would have done little toward carrying *petitioner's burden* of affirmatively showing that any portion of the DPT vaccine *did*

cause her myocarditis.) Petitioner, thus, has failed again to demonstrate any substantial prejudice from the loss of the autopsy slides.

*Id.* at 12. The special master apparently based his conclusion in part on a post-hearing declaration in which Dr. Graeser stated that a test does not exist that would disclose the presence of the diphtheria toxins or components of the vaccination in Shanelle's heart tissue.

The special master's analysis again is reasonable. If no test exists that shows the presence of the diphtheria toxins or vaccine components in Shanelle's heart tissue, it is not apparent that further tests on the slides could produce the required "logical sequence of cause and effect" between the DPT vaccination and Shanelle's death. Moreover, the instant situation is not one where petitioner was denied access to the evidence that respondent ultimately lost. Prior to the loss of the evidence, petitioner's expert, Dr. Spitz, examined the evidence, which included slides of Shanelle's organs and the organs themselves, including Shanelle's heart. Dr. Spitz therefore had an opportunity to perform any tests that he believed would help petitioner satisfy her burden of proof. Petitioner admittedly lost the opportunity to show the evidence to her other experts, but Dr. Spitz is a board-certified pathologist and it is not apparent that petitioner's other experts would have treated the evidence in a manner different than Dr. Spitz. Viewing the record as a whole, the court cannot conclude that the special master committed reversible error in concluding that petitioner failed to show that she was prejudiced in any substantial way by the loss of this evidence.

### Conclusion

For the reasons set forth above, this court affirms the special master's February 3, 1994, decision denying compensation. The Clerk of the Court shall enter judgment accordingly.

IT IS SO ORDERED.