**Steven FRANK, personal representative of Zachary Hinkle, deceased, Petitioner,**

**v.**

**SECRETARY OF the DEPARTMENT OF HEALTH AND HUMAN SERVICES, Respondent.**

No. 94–329V.

United States Court of Federal Claims.

Aug. 2, 1995.

Gustav L. Nelson, III, Newport News, VA, attorney of record for petitioner.

Catharine E. Reeves, United States Department of Justice, Washington, DC, attorney of record for respondent.

### OPINION

HORN, Judge.

The above-captioned case is before this court on petitioner's motion for review of the special master's opinion, issued on February 14, 1995, denying compensation to the petitioner. On May 18, 1994, petitioner filed a claim for compensation under the National

Vaccine Injury Act, 42 U.S.C. §§ 300aa–1 through 300aa–34 (1995) (hereinafter Vaccine Act).[1] The petition alleged that Zachary Hinkle had suffered an encephalopathy as defined in the Vaccine Act Injury Table, resulting from his May 20, 1992 Diphtheria–Pertussis–Tetanus (hereinafter DPT) vaccination, and that his death on May 22, 1992 was the sequela of that injury.

Respondent filed its reply report with the Office of the Special Masters of the United States Court of Federal Claims on August 16, 1994, in accordance with Appendix J of the Rules of the United States Court of Federal Claims (Vaccine Rules), specifically, Vaccine Rule 4(b), requesting dismissal of the petition. The respondent alleged that petitioner had failed to demonstrate by a preponderance of the evidence that Zachary had suffered an on-Table Injury. Respondent further asserted that the record establishes that Zachary's death was caused by a viral respiratory illness, a factor unrelated to his DPT vaccination.

With the consent of both parties, the special master decided this case without a hearing and based her decision solely on the documentary evidence submitted by both parties. Special Master Laura Millman issued an opinion, dated February 14, 1995, in which she concluded that petitioner was not entitled to compensation for Zachary's death.

On March 16, 1995, petitioner filed a motion for review of the special master's decision, together with a memorandum in support of the motion for review. Petitioner alleges that, because petitioner's expert, Dr. William A. Cox, was the only expert in the record to specifically identify a cause of Zachary's death, namely, encephalopathy, and because respondent's experts had not offered any explanation for Zachary's death, the cause of death established by petitioner's expert should be accepted by the court.[2] In response, the government argues that the court should affirm the special master's decision because the petitioner has not met the applicable burden of proof.

### FACTS

Zachary Hinkle was born on December 24, 1991, in Newport News, Virginia. Mrs. Jacqueline Hinkle, Zachary's mother, had experienced a difficult pregnancy, complicated by gestational diabetes. Mrs. Hinkle had a fever of 100.4 degrees for twelve hours prior to delivery.

Zachary was a pre-term baby, weighing 2,270 grams upon physical examination, who was noted to be in respiratory distress and showing signs of hyperbilirubinemia at birth. As a result, he was initially sent to the Special Care Nursery of the Riverside Regional Medical Center. The Newborn Admission Assessment indicates that Zachary was dusky, had nasal flaring and retractions, and had moist breath sounds. He had a poor suck reflex and his muscle tone was floppy. After initial workup in the Special Care Nursery, Zachary was started on Ampicillin and Gentamicin. The nurses' notes, some of which are presented as illegible photocopies in the record, indicate that Zachary was ultimately placed under routine nursery care and was discharged in good condition on December 30, 1991.

1. Tit. XXI, § 2112, as added Nov. 14, 1986, Pub.L. No. 99–660, tit. III, § 311(a), 100 stat. 3761; Dec. 22, 1987, Pub.L. No. 100–203, tit. IV, §§ 4303(d)(2)(A), 4307(3), 101 Stat. 1330–222, 1330–224 and amended Dec. 22, 1987, Pub.L. No. 100–203, tit. IV, §§ 4307(3)(c), 4308, as amended and added July 1, 1988, Pub.L. No. 100–360, tit. IV, § 411(o)(2), (3)(A), 102 Stat. 808; Dec. 19, 1989, Pub.L. No. 101–239, tit. IV, § 6601(d)–(i), 103 Stat. 2286–2290; Nov. 3, 1990, Pub.L. No. 101–502, § 5(b), 104 Stat. 1286; Nov. 26, 1991, Pub.L. 102–168, tit. II, § 201, 105 Stat. 1102; Oct. 27, 1992, Pub.L. 102–531, tit. III, § 314, 106 Stat. 3508; June 10, 1993, Pub.L. 103–43, tit. XX, § 2012, 107 Stat. 214; Aug. 10, 1993, Pub.L. 103–66, tit. IV, § 13632, 107 Stat. 645; Dec. 14, 1993, Pub.L. 103–183, tit. VII, § 708.

2. The allegation in petitioner's motion for review reads:

> Here, the evidence shows that only one expert identified a cause of Zachary Hinkle's death, and that was petitioner's expert, Dr. Cox. The Respondent's experts did not identify a cause of death and all three of the experts disagreed with the medical examiner that the upper respiratory infection caused the death. Thus, Petitioner would argue that the cause of death was established and that compensation should be awarded.

On January 21, 1992, Zachary was seen at Sentara Hospital in Hampton, Virginia for an upper respiratory infection. He had yellow nasal congestion, which reportedly had its onset on January 19, 1992. Otherwise, his chest was clear, his temperature was 99.2 and he was happy and alert with good color. His mother was instructed in the proper use of a bulb syringe to clear the congestion and amoxil was prescribed.[3]

On February 8, 1992, Zachary was seen again at Sentara. At that time, his general condition was good, but he was very congested. Zachary had been on antibiotics for the two prior weeks, but he was not improving. Zachary's parents were advised that he should rest and drink lots of fluids.

On March 22, 1992,[4] Zachary returned to Sentara Hospital, this time with an acute upper respiratory infection and a fever. He had suffered from a cold for two weeks prior to this third visit to Sentara Hospital, and remained congested with a lot of mucous. Amoxil and Rondec were prescribed and rest and fluids were advised.

Subsequently, on May 20, 1992, Zachary was seen by Linda Schneider, M.D. for the first time. Zachary had been exposed to chicken pox and, upon physical examination by Dr. Schneider, was described as a well-developed, alert little boy. Because Zachary had never received any vaccinations, Dr. Schneider administered DPT and OPV # 1 immunizations, subsequent to examining Zachary on May 20, 1992.[5]

According to the affidavit of Jacqueline Hinkle, Zachary's mother, at around 4:30 or 5:00 p.m. on May 20, 1992, she put Zachary to bed and he slept for six hours. For the rest of the night, Zachary was very irritable and, finally, at 7:00 a.m. on May 21, 1992, he refused to sleep at all. His mother also indicated that he had a fever and his cold was getting worse.

At approximately 4:00 p.m. on May 21, 1992, Mrs. Hinkle tried to lay Zachary down to sleep, but after about three hours of crying, she picked him up. Mrs. Hinkle had thought that Zachary might be overly tired and tried to let him cry himself to sleep, but his crying did not let up. In retrospect, Mrs. Hinkle described Zachary's cry as having sounded very guttural. She then proceeded to hold Zachary constantly. He was flushed, not nursing well, and seemed melancholy and lifeless.

According to Dr. Schneider's records, on May 21, 1992, Mrs. Hinkle phoned Dr. Schneider for advice concerning Zachary's fever of 102 and upper respiratory symptoms. The record reflects that Dr. Schneider prescribed Tylenol suppositories and Rondec or Triaminic. According to Dr. Schneider's records, she also advised Mrs. Hinkle to bring Zachary to her office or to the emergency room because of the fever. But, according to the doctor's records, Mrs. Hinkle apparently told Dr. Schneider that she did not want to do either of these things and told the doctor that she would try to get Zachary's fever under control first.

According to the doctor's records, also on May 21, 1992, Zachary was reported by his mother to Dr. Schneider as having "quite a bit of fever" and as having developed a cold since he got his vaccination. Mrs. Hinkle reported having trouble getting Zachary to take the prescribed Rondec drops and he was also refusing Tylenol, which suggests a second phone call to Dr. Schneider was made by Mrs. Hinkle on May 21, 1992. She was advised to use Tylenol suppositories and was encouraged to get some Rondec or Triaminic

---

3. In her opinion, the special master incorrectly stated that Zachary saw his doctor on January 21, and "[a]lso that day, he was taken to Sentara Hampton General Hospital Emergency Room...." It appears from the official record, however, that Zachary only was taken to Sentara Hampton General Hospital Emergency Room on January 21, 1992.

4. The special master incorrectly stated that Zachary was taken to Sentara on March 23, 1992.

5. The language used by the special master suggests that Zachary went to Dr. Schneider's office for the purpose of getting his first DPT shot. According to the affidavits of Zachary's mother and father, however, Zachary's brother James was the only child with an appointment. James, who had chicken pox, needed a note stating that his chicken pox were no longer contagious and that he could return to school. Because Zachary, his mother, and his other two siblings had not yet had the chicken pox, Dr. Schneider also wanted to examine them.

down Zachary any way that she could. The record, however, is ambiguous as to whether all of Dr. Schneider's suggestions were given during a first conversation with Mrs. Hinkle or in a second telephone call.[6] Unfortunately, however, neither in Dr. Schneider's notes, or elsewhere in the record, is there an indication of the time of Mrs. Hinkle's phone call(s) with Dr. Schneider.

According to Mrs. Hinkle's affidavit, by 12:00 a.m. on May 22, 1992, Zachary's fever and congestion were gone. After being awake for nearly eighteen hours, Zachary finally fell asleep. Zachary awoke at about 5:30 or 6:00 a.m. and was fed. Upon checking Zachary's diaper, which was wet and had been soiled, Mrs. Hinkle "was relieved to see he was back to normal." Sometime after 5:30 a.m., Mrs. Hinkle laid Zachary back in his crib and, after whining a little, he went back to sleep.

Brian Hinkle, Zachary's father, checked Zachary at about 10:00 a.m. Mr. Hinkle put his hand on Zachary's back and he was not breathing. The parents immediately called 911.

A Pre–Hospital Patient Care Report from the Hampton Fire and Rescue Squad, dated May 22, 1992, indicates that the squad found Zachary on his stomach with his face blue and purple, stiff in his extremities, and with a warm temperature on the trunk of his body. The infant was unresponsive and pronounced "Dead On Arrival" at the scene and was transported to the hospital. The admission history at Sentara Hospital reveals that Zachary was pronounced dead at 11:19 a.m. on May 22, 1992. Zachary's body was sent to Norfolk, Virginia for an autopsy.

The Medical Examiner's Certificate, dated and filed June 9, 1992, amended August 19, 1992, listed the "IMMEDIATE CAUSE (Final disease or condition resulting in death)" as "Viral Respiratory Illness." Page one of the "Report of Investigation by Medical Examiner," dated May 26, 1992, also attributes the death to viral respiratory illness. Page two of the same report, however, states: "At this time, death is attributed to Sudden Infant Death Syndrome pending autopsy findings."[7] According to the autopsy report, Zachary had marked pulmonary congestion and edema, scant petechial hemorrhages over his thymus gland and the epicardial surface of his heart, and congestion of his spleen and the leptomeninges of his brain. The cause of death was listed on the autopsy as "viral respiratory illness." A case summary and comment, attached to the autopsy, dated August 10, 1992, also notes a mild post-vaccination febrile illness, but states that the cause of Zachary's death was viral respiratory illness and that inflammation was present throughout the respiratory tract.

### DISCUSSION

When deciding a motion to review a special master's decision, the judges of this court shall:

(A) uphold the findings of fact and conclusions of law of the special master and sustain the special master's decision,

(B) set aside any findings of fact or conclusions of law of the special master found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with

---

6. According to Jacqueline Hinkle's affidavit, she only made one phone call to Dr. Schneider on May 21, 1992, and called Ask-a-Nurse later that evening because Zachary seemed constipated. The affidavit of Brian Hinkle, Zachary's father, is inconsistent with his wife's affidavit and apparently with Dr. Schneider's records. According to Mr. Hinkle's affidavit, his wife first called Dr. Schneider on May 20 and was told not to worry, to "give the baby some tylanol [sic] and to go ahead and let him ride it out." Also, according to Mr. Hinkle, his wife called the doctor again on May 21 and "was again told not to worry, that it was just a reaction from the shot" and to get suppositories if the fever did not go down. Additionally, Mr. Hinkle claims that at no point in

either of the two phone conversations did Dr. Schneider mention anything about bringing Zachary into her office. According to Mr. Hinkle, if Dr. Schneider had said that Zachary should be brought to her office, he would have complied with her suggestion. These claims by Mrs. Hinkle, however, are based on hearsay because Mrs. Hinkle made the phone call(s) to Dr. Schneider and apparently provided her husband with the information, which he included in the affidavit submitted to the court.

7. The special master cites only to page two of the report and not to page one which lists Viral Respiratory Illness as the cause of death.

law and issue its own findings of fact and conclusions of law, or,

(C) remand the petition to the special master for further action in accordance with the court's direction.

42 U.S.C. § 300aa–12(e)(2).

As stated in the legislative history of the Vaccine Act:

> The conferees have provided for a limited standard for appeal from the [special] master's decision and do not intend that this procedure be used frequently but rather in those cases in which a truly arbitrary decision has been made.

(citing H.R.Conf.Rep. No. 386, 101st Cong., 1st Sess. at 512–13, 517, *reprinted in* 1989 U.S.Code Cong. & Admin.News 1906, 3115, 3120).

Although review by the judges of this court of decisions issued by the special master should be conducted within the bounds described above, 42 U.S.C. § 300aa–12(e)(2) dictates that the judges of this court should utilize differing and distinguishable standards of review, depending upon which aspect of the case is under scrutiny. As stated by the United States Court of Appeals for the Federal Circuit:

> These standards vary in application as well as degree of deference. Each standard applies to a different aspect of the judgment. Fact findings are reviewed by us, as by the Claims Court judge, under the arbitrary and capricious standard; legal questions under the 'not in accordance with law' standard; and discretionary rulings under the abuse of discretion standard. The latter will rarely come into play except where the special master excludes evidence.

*Munn v. Sec'y DHHS,* 970 F.2d 863, 870 n. 10 (Fed.Cir.1992). Adopting these guidelines, a United States Court of Federal Claims judge in *Cox v. Sec'y DHHS* likewise wrote:

> Each standard articulated in 42 U.S.C. § 300aa–12(e)(2)(B) applies to a different aspect of the special master's decision. The court evaluates findings of fact under the 'arbitrary and capricious standard'; legal conclusions under the 'not in accor-

dance with the law standard'; and discretionary rulings under the 'abuse of discretion standard.' *See Munn v. Sec'y DHHS,* 970 F.2d 863, 870 (Fed.Cir.1992).

*Cox v. Sec'y DHHS,* 30 Fed.Cl. 136, 142 (1993); *see also Perreira v. Sec'y DHHS,* 27 Fed.Cl. 29, 31 (1992), *aff'd,* 33 F.3d 1375 (Fed.Cir.1994).

■ The arbitrary and capricious standard of review is a narrow one. *Johnston v. Sec'y DHHS,* 22 Cl.Ct. 75, 76 (1990); *Perreira v. Sec'y DHHS,* 27 Fed.Cl. at 32. Pursuant to this standard, the special master's judgment is to be accorded great deference. *Skinner v. Sec'y DHHS,* 30 Fed.Cl. 402, 408 (1994). In reviewing the special master's holding, this court is not to substitute its own judgment for that of the special master. *Skinner v. Sec'y DHHS,* 30 Fed.Cl. at 408 (*citing Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 413–16, 91 S.Ct. 814, 822, 28 L.Ed.2d 136 (1971)). "If the special master has considered the relevant evidence of record, drawn plausible inferences and articulated a rational basis for the decision, reversible error will be extremely difficult to demonstrate." *Hines v. Sec'y DHHS,* 940 F.2d 1518, 1528 (Fed.Cir.1991); *Estate of Arrowood v. Sec'y DHHS,* 28 Fed.Cl. 453, 457 (1993). As long as the special master has "considered all relevant factors, and has made no clear error of judgment," the decision should stand. *Lonergan v. Sec'y DHHS,* 27 Fed.Cl. 579, 580 (1993).

Although the arbitrary and capricious standard is widely used, there is no uniform definition of this standard. In *Hines v. Sec'y DHHS,* however, the court has accumulated, and offered as guidance, a wide variety of examples in which the arbitrary and capricious standard has been applied:

> 'an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise,' *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Automobile*

*Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 2867, 77 L.Ed.2d 443 (1983) (review of agency rule making); agency must articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made,' *Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 168, 83 S.Ct. 239, 246, 9 L.Ed.2d 207 (1962) (review of agency adjudication); 'proof that there was 'no reasonable basis' for the administrative decision will also suffice [to show arbitrary and capricious conduct], at least in many situations,' *Prineville Sawmill Co. v. United States,* 859 F.2d 905, 913 (Fed.Cir.1988) (quoting *Keco Ind., Inc. v. United States,* 492 F.2d 1200, 1203–04, 203 Ct.Cl. 566 (1974)) (review of preaward bid protest action against letting of government contract); reviewing court must "guard against an agency's drawing inferences that are 'arbitrary' in relation to the facts found, no matter how substantial may be the support for those facts," *Midtec Paper Corp. v. United States,* 857 F.2d 1487, 1498 (D.C.Cir.1988) (review of agency adjudication); 'the central focus of the arbitrary and capricious standard is on the rationality of the agency's 'decision-making,' rather than its actual decision,' *United States v. Garner,* 767 F.2d 104, 116 (5th Cir.1985); 'whether the decision was based on a consideration of relevant factors, whether there has been a clear error of judgment and whether there is a rational basis for the conclusions . . .,' *Mobil Oil Corp. v. Department of Energy,* 610 F.2d 796, 801 (Temp.Emer.Ct.App.1979), *cert. denied,* 446 U.S. 937, 100 S.Ct. 2156, 64 L.Ed.2d 790 (1980) (review of agency rulemaking) (quoting *Texaco, Inc. v. Federal Energy Admin.,* 531 F.2d 1071, 1076–77 (Temp.Emer.Ct.App.1976)).

*Hines v. Sec'y DHHS,* 940 F.2d at 1527–28.

The scant one page, two line, memorandum in support of the motion for review, filed by counsel on behalf of the petitioner, contesting the special master's decision, completely disregards the requirements set forth in Vaccine Rule 24. According to Rule 24, the memorandum:

must fully and specifically state and support each objection to the decision. The memorandum shall cite specifically to the record created by the special master, *e.g.,* to specific page numbers of the transcript, exhibits, etc., and should also fully set forth any legal argument the party desires to present to the reviewing judge.

RCFC, App.J., R. 24. Petitioner's very brief motion for review, in its entirety, consists of the following:

The Petitioner, Steven Frank, for his memorandum in support of review in the above matter, states as follows: 1. The initial medical autopsy indicated a diagnosis of SIDS. Med. Recs. at Ex. 11, p. 2. The report of Dr. Valdes–Dapena, an expert for the respondent also indicated a diagnosis of SIDS. R.'s Ex. B. Although the medical examiner later changed her mind about the diagnosis, this was not done until August 19, 1992, nearly three months after Zachary Hinkle's death. Also, the report of Dr. Baumann, R.'s Ex. D., merely concludes that Zachary did not die from the DPT vaccination but offers not [sic] other explanation. Except for the medical examiner, none of the experts ascribes Zachary's death to the upper respiratory infection which was present. The only expert who provided an opinion as to the actual cause of Zachary's death was Dr. Cox, who states that it was due to a DPT related encephalopathy. Med. Recs. at Exs. 20, 21. Pursuant to 42 USCS Section 300aa–13(a), the petitioner must demonstrate by a preponderance of the evidence the existence of a table injury. Also, the preponderance of the evidence must not show that the table injury occurred as are [sic] result of some other factor unrelated to the administration of the vaccine. Here, the evidence shows that only one expert identified a cause of Zachary Hinkle's death, and that was petitioner's expert, Dr. Cox. The Respondent's experts did not identify a cause of death and all three of the experts disagreed with the medical examiner that the upper respiratory infection caused the death. Thus, Petitioner would argue that the cause of death was established and that compensation should be awarded.

■ Although petitioner's memorandum is conclusory and unsupported by authority, this court will address the issues raised in petitioner's motion for review and dispose of petitioner's motion on the merits.

Entitlement to compensation under the Vaccine Act is determined pursuant to the statutory guidelines set forth in the Vaccine Act. The petitioner must show that an on-Table injury occurred and that Zachary's death was a sequela of that injury. 42 U.S.C. §§ 300aa–13(a)(1)(A). According to the Act, a petitioner, in this case the legal representative of the deceased, is entitled to compensation only if the petitioner can show, by a preponderance of the evidence, that the case presented meets the multiple criteria specified in the Vaccine Act. 42 U.S.C. § 300aa–13(a)(1)(A). In the context of a Vaccine Act case, the preponderance of the evidence standard has been defined as more than a probability. The special master must "believe that the existence of a fact is more probable than its nonexistence before the [special master] may find in favor of the party who has the burden to persuade the [special master] of the fact's existence." *Ciotoli v. Sec'y DHHS,* 18 Cl.Ct. 576, 588 (1989) (quoting *In re Winship,* 397 U.S. 358, 371–72, 90 S.Ct. 1068, 1076, 25 L.Ed.2d 368 (1970) (Harlan J. concurring) (quoting F. James Civil Procedure 250–1 (1965))). Stated otherwise, the preponderance of the evidence standard requires the petitioner to "adduce evidence that makes the existence of a contested fact more likely than not." *Arrowood v. Sec'y DHHS,* 28 Fed.Cl. at 458 (quoting *McClendon v. Sec'y DHHS,* 23 Cl.Ct. 191, 195 (1991)) (citing Black's Law Dictionary 1064 (5th ed., 1979)).

The Act also requires that the special master find "that there is not a preponderance of the evidence that the illness, disability, injury, condition or death described in the petition is due to factors unrelated to the administration of the vaccine described in the petition." *See* 42 U.S.C. § 300aa–13(a)(1)(B) (1995). Unless the petitioner has proven the elements of 42 U.S.C. § 300aa–11(c), as mandated by 42 U.S.C. § 300aa–13(a)(1)(A), by a preponderance of the evidence, then the respondent does not have an obligation to prove an alternative cause for Zachary's death. *See Bradley v. Sec'y DHHS,* 991 F.2d 1570, 1575 (Fed.Cir.1993) (holding that alternative causation theories, referred to in subsection 42 U.S.C. § 300aa–13(a)(1)(B), need not be addressed when petitioner has not demonstrated by a preponderance of the evidence a Table Injury or causation, as is required under subsection (A) of the same statute).

Upon review of the record presented in this case, the court concludes that the special master has "considered all relevant factors, and has made no clear error of judgment." *Lonergan v. Sec'y DHHS,* 27 Fed.Cl. at 581. This court agrees with the special master's final conclusion that petitioner failed to satisfy the burden of proof to demonstrate that Zachary's death was caused by an on-Table encephalopathy. In reaching this conclusion, the special master properly relied upon the definition of "encephalopathy," included in the "Qualifications and aids to interpretation" of the Vaccine Injury Table, which states:

> The term "encephalopathy" means any significant acquired abnormality of, or injury to, or impairment of function of the brain. Among the frequent manifestations of encephalopathy are focal and diffuse neurologic signs, increased intracranial pressure, or changes lasting at least 6 hours in level of consciousness, with or without convulsions. The neurological signs and symptoms of encephalopathy may be temporary with complete recovery, or may result in various degrees of permanent impairment. Signs and symptoms such as high pitched and unusual screaming, persistent unconsolable crying, and bulging fontanel are compatible with an encephalopathy, but in and of themselves are not conclusive evidence of encephalopathy. Encephalopathy usually can be documented by slow wave activity on an electroencephalogram.

42 U.S.C. § 300aa–14(b)(3)(A).

In her decision, the special master reviewed and chose between the several conclusions reached by expert witnesses presented by petitioner and respondent. The special master referred to the conclusion offered by petitioner's expert, Dr. William A. Cox, which states as follows:

The medical records which I reviewed show morphologic changes in the brain of Zachary Hinkle which are consistent with Steinman's murine model for pertussis toxin encephalopathy. The inflammatory response in Zachary's upper and lower respiratory system was clearly not severe enough to account for his death. Also, there was no evidence that Zachary's alleged exposure to chicken pox played any perceptible role in his death.

It is, therefore, my opinion, *within a reasonable degree of probability* that Zachary sustained a pertussis induced encephalopathy which manifested itself initially by unconsolable crying, eventually terminating in his death on May 22, 1992, within approximately 2–4 hours after his 0530 feeding." (Emphasis added.)

Further, the special master took note that according to respondent's expert, Dr. Robert J. Baumann: "Zachary did not have an encephalopathy or any disease that Dr. Baumann could link to his DPT vaccination. He ascribed his irritation to his upper respiratory infection."

In a report issued on October 5, 1994, Dr. Baumann included the following conclusions and criticisms of Dr. Cox's expert opinion, as follows:

Zachary had a slight cough and had received Rondac drops on May 20, 1992 before his immunization. I believe his cough was the initial manifestation of the viral illness, that gave him fever and irritability that evening. The fever, irritability and associated symptoms from that viral URI ended at about midnight the next day. As his mother indicates on page 1 of her Affidavit: (about the events on May 21) '... He had a fever and his cold was getting worse. I gave him tylenol for the fever and Rondac for the congestion.' While the preceding DPT immunization may have played a minor role in Zachary's fever and irritability such immunizations do not produce congestion or other symptoms of an URI. Moreover all three pathologists who have reviewed the slides from Zachary's autopsy agree that the microscopic sections demonstrate changes typical of a URI.

In any event it is important to note that Zachary's symptoms terminated hours before his death. Between Midnight and 1:30 am on May 22, his mother tells us: '... the fever is gone, the congestion seems gone.... About 5:30 a.m. Zachary woke up, he was hungry, I fed him. Upon checking his diaper I was relieved to see he was back to normal.... I laid him back in his crib, glad that his reaction had passed (Affidavit page 2)'

Dr. Cox does not discuss the entity of sudden infant death in arriving at his opinion. Moreover, though he correctly indicates that the autopsy '... changes, in of themselves, are absolutely non-specific.' he nevertheless seems to base his opinion upon them.

Dr. Cox also believes that Zachary '... experienced an encephalopathy which manifested itself by persistent inconsolable crying ...' (Affidavit page 12). He subsequently presents references to 'uncontrollable screaming' and '... persistent high-pitched crying' on page 13. Dr. Cox doesn't appear to understand the unique clinical picture presented by infants who have the high-pitched scream associated with an acute encephalopathy. On page 12 he erroneously indicates that this is the same as ordinary crying ('... clearly, uncontrollable screaming or, if you will, crying ...'). He also ignores Ms. Hinkle's description where she indicates that Zachary's '... cry sounded strange to me, very guttural ...' (Affidavit, page 2). A guttural cry is typical of infants who are hoarse (as from inflammation of the trachea and epiglottis). Ms. Hinkle's description of Zachary's behavior fits the picture of an irritable child (such as is commonly seen with a URI). Her description does not portray an acutely encephalopathic infant. Dr Cox also ignores the sequence of events wherein the crying and irritability terminate a substantial period before the infant's sudden death.

Finally, the special master considered evidence offered by a second expert on behalf of the respondent, Dr. Marie Valdes–Dapena. Dr. Valdes–Dapena concluded that Zachary's death should be attributed to SIDS and stat-

ed that Zachary did not have an encephalopathy. Dr. Valdes–Dapena stated: "Encephalopathy is, of course, a clinical state; there is *no* pathologic equivalent of it. His *minor respiratory illness is reflected in the* sections but would not have been expected to take his life."

In reviewing whether the petitioner had proven the cause of Zachary's death as the result of an on-Table encephalopathy, the special master pointed out that although Zachary did not have an EEG, "[t]he medical records do not substantiate any increased intracranial pressure before the agonal process, bulging fontanel, or convulsions." Moreover, as indicated in the statute, while the record suggests that Zachary exhibited signs of persistent inconsolable crying, this symptom, by itself, is insufficient to warrant a finding that an encephalopathy occurred.

Based on a review of the expert testimony presented, together with the written documents submitted as part of the record, the special master determined that petitioner was not entitled to compensation following Zachary's death because "the reason for his death remains unknown." The special master found it "of primary significance ... that he [Zachary] recovered from the reaction." According to the special master: "He resumed normal functioning, eating, urinating, defecating, sleeping." In essence, not only did the special master find that petitioner had not met his burden of proof to establish death as a result of an encephalopathy, but the special master found it irrelevant whether Zachary had or had not suffered an encephalopathy because if he did, he had "recovered from it before he died." According to the special master, Dr. Cox failed to discuss that the symptomatology, upon which the doctor relied in order to reach his conclusion, had ceased four and one-half hours prior to finding Zachary dead at 10:00 a.m. on May 22, 1992. The special master determined that Dr. Cox's failure to deal with this sequence of events demonstrated a major oversight in his analysis. As a result, the special master concluded that "[t]here is nothing in the record to distinguish Zachary's condition from a transient reaction to DPT."

This court agrees with the special master that Dr. Cox did not explain in his affidavit report or supplemental report[8] how Zachary's death was a result of a DPT-related encephalopathy, or explain away the evidence that Zachary may have recovered from any possible reaction prior to his death. In his supplemental report, Dr. Cox, without explanation, concluded that merely because Zachary awoke and ate at 0630 hours and was found dead at 1000 hours "does not, within a reasonable degree of medical probability, negate death due to an encephalopathy."

In determining whether to award compensation, 42 U.S.C. § 300aa–13(b)(1)(B) dictates that the special master shall consider all relevant medical and scientific evidence in the record. However, "any 'diagnosis, conclusion, judgment, test result, report, or summary shall not be binding.'" *See also Summar v. Sec'y DHHS,* 24 Cl.Ct. 440, 444 (1991) (citing 42 U.S.C. § 300aa–13(b)(1)(B)). Nonetheless, although not bound by the opinion of the experts, the special master, without having a reasonable basis, should not discredit or reject the expert testimony offered. *See Bunting v. Sec'y DHHS,* 931 F.2d 867, 873 (Fed.Cir.1991). As stated in a previous Claim Court opinion:

"While it is true that the fact finder in vaccine cases is not bound by the opinions of a medical expert, § 300aa–13(b)(1), *Bunting* unequivocally establishes that such evidence cannot be rejected without a reasonable basis therefor. That is, the fact finder may not dismiss such testimony without providing a thorough, rational explanation for doing so because to do otherwise would be tantamount to arbitrary and capricious decision-making."

*McClendon v. Sec'y DHHS,* 23 Cl.Ct. 191, 199 (1991), *aff'd,* 41 F.3d 1521 (Fed.Cir. November 23, 1994). Based on the record presented in the instant case, and the expert testimony of respondent's experts, the special master had a reasonable basis for reject-

---

**8.** Dr. Cox's supplemental report was submitted by the petitioner and cited to by the special master in her final decision. It appears from the record, however, that the supplemental report submitted by Dr. Cox was never filed. Under the presumption that this was an oversight on the part of the special master, this court has filed the supplemental opinion in the official court record.

**38**

ing Dr. Cox's expert opinion that Zachary's death was caused by a DPT-induced encephalopathy.

■ Petitioner also argues that because petitioner's expert was the only expert who identified a cause of Zachary's death and because respondent's experts did not offer any alternative explanation for the cause of Zachary's death, the special master should have ruled in petitioner's favor on compensation. Even if the court could ignore the expert testimony offered by Dr. Baumann and Dr. Valdes–Dapena, the autopsy report and the other testimony and documents in the record, petitioner's argument misinterprets the Vaccine Act's burden-shifting provisions included in § 300aa–13(a)(1). *See Gamache v. Sec'y DHHS*, 27 Fed.Cl. 639, 645 (1993), *aff'd*, 5 F.3d 1505 (Fed.Cir. August 11, 1993). Because petitioner in the instant case never was able to establish that Zachary suffered an encephalopathy and that his death was a sequela of that injury, the burden never shifted to the respondent to establish an alternative cause of death. *See id.* In other words, "the absence of an alternative cause of injury does not meet the affirmative duty to show causation." *Hodges v. Sec'y DHHS*, 9 F.3d 958, 960 (Fed.Cir.1993).

### *CONCLUSION*

After careful review of the special master's decision, the court finds that the decision of the special master to deny compensation to the petitioner was not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law. Although the circumstances surrounding Zachary's death, as indicated by the special master, are tragic, the statutory provisions of the Vaccine Act do not permit compensation to a petitioner presenting the facts of the case currently before the court. Therefore, petitioner's motion for review is, hereby, DENIED and the court, hereby, AFFIRMS the special master's February 14, 1995 decision denying compensation. The clerk of the court is directed to enter judgment accordingly.

**IT IS SO ORDERED.**