**Deborah Anderson ROCHESTER, as Administrator of the Estate of Gaylene L. Anderson, deceased**

v.

**The UNITED STATES.**

No. 89–4V.

United States Claims Court.

Oct. 10, 1989.

Rodney A. Klein, Sacramento, Cal., attorney of record, for petitioner.

## ORDER

MEROW, Judge.

Under the National Childhood Vaccine Compensation Program, 42 U.S.C. § 300aa–1, *et seq.* (Supp. V 1987), this matter comes before the court on the basis of the Report and Recommendation, filed September 8, 1989, of the assigned Special Master, David A. Gerard.

No objection to the Special Master's findings or conclusions of law has been filed and the time to so file has expired.

Accordingly, it is ORDERED:

(1) With the exception of the recommendation with respect to finding a default, the report, including the findings and conclusions of law, filed September 8, 1989, is adopted by the court pursuant to 42 U.S.C. § 300aa–12(d)(2), and the full Report shall be attached hereto;[1]

(2) Judgment shall be entered for the petitioner in the amount of $280,000, as provided in the following adopted Report, with no additional costs to be awarded.[2]

---

1. As the judgment recommended and adopted in this matter is premised upon the evidence of record and not on a default by defendant, and as respondent did not seek to file objections or otherwise further participate in this matter, following the filing of the Report on September 8, 1989, the issue of default is considered to be moot.

2. The Report filed September 8, 1989, in footnote 1, provided that within 14 days of its filing, the parties shall designate any material therein for deletion prior to public access. No designation was submitted. This order contains no additional material. Accordingly, public access for this filing shall now be afforded.

REPORT AND RECOMMENDATION [1]

Filed Sept. 8, 1989

DAVID A. GERARD, Special Master.

On behalf of her deceased daughter, Gaylene L. Anderson, petitioner filed this application for compensation under the National Childhood Vaccine Injury Act of 1986 [2] [hereafter the "Act"]. The petitioner claims, that as a direct result of the administration of a DPT [3] vaccination, her daughter suffered a shock collapse or hypotonic-hyporesponsive collapse [hereafter "HHC"] or, in the alternative, an encephalopathy, either of which resulted in her death. Petitioner seeks an award of $250,-000 for the estate of the deceased, including $36,158 as reasonable attorneys' fees and $2,129.45 for costs incurred.

Pursuant to § 300aa–12(c)(2) and Vaccine Rule 18 and based upon all the credible evidence in the record, the undersigned recommends that the court award petitioner compensation in the amount of $250,000 pursuant to § 300aa–15(a)(2). Based upon the statements submitted by petitioner's counsel, the undersigned recommends that the court's judgment include the sum of $27,870.55 for reasonable attorneys' fees and $2,129.45 as reimbursement for the costs reasonably incurred in the prosecution of this petition and a prior civil action. Judgment should be rendered for petitioner in the amount of $280,000.

## BACKGROUND

On January 19, 1989, petitioner filed her initial petition for compensation under the Act. Richard Parker, an attorney with the United States Department of Justice, filed a notice of appearance on behalf of the respondent, the Secretary of Health and Human Services [hereafter the "Secretary"]. Although the Secretary timely answered the initial petition, his failure to file any answer to either of the two amended petitions amounts to a technical default. The Secretary's counsel participated in two status conferences and formally withdrew his notice of appearance on May 9, 1989, one month before the hearing. Although the Secretary was directed to do so, he did not timely file any medical evaluation opposing petitioner's claim or suggesting any alternative cause of Gaylene Anderson's injuries. Whatever merit may have existed in the Secretary's case, he chose neither to actively defend this action nor to illuminate the petitioner or the court about the factual and legal bases of his opposition to compensation. As a result of the Secretary's default, this recommendation is necessarily based upon the uncontroverted evidence submitted by petitioner into the record. [4]

The hearing was held on July 13, 1989, in San Francisco, California. Kevin C. Geraghty, M.D., Deborah Anderson Rochester, and Bonnie Lee Rochester appeared as witnesses in support of the petition. Fifteen exhibits were admitted into evidence. The Secretary sent a letter, dated July 13, 1989, to the special master seeking to hold this proceeding in abeyance for an indeterminate period of time. By Order, filed on July 24, 1989, the undersigned denied the Secretary's request to suspend this proceeding in order to submit additional evidence. In the Order, both parties were given additional time to add to the record of this case. Neither party chose to file any additional evidence.

The issues to be decided are whether petitioner has demonstrated by a preponderance of the evidence that the injuries

---

1. This report may contain information that may not be disclosed to a non-party. *See* 42 U.S.C. § 300aa–12(c)(2) (Supp. V 1987). Accordingly, within fourteen (14) days from the date of this report, the parties shall designate any material subject to § 300aa–12 and such designated material will be deleted for public access. If on review of this report, there are no objections filed within the fourteen (14) day period, then it shall be deemed that there is no material subject to § 300aa–12.

2. Pub.L. No. 99–660, enacted November 14, 1986, amended by Pub.L. No. 100–203 (1987) and Pub.L. No. 100–360 (1988) (codified at 42 U.S.C. §§ 300aa–1 to 300aa–34 (Supp. V 1987)).

3. Diphtheria and *tetanus toxoids with pertussis* vaccine.

4. *See* RUSCC Rule 53(d), which provides that if a party fails to appear at the hearing, the special master may proceed *ex parte; In re Kosmadakes,* 444 F.2d 999 (D.C.Cir.1971).

suffered and the resultant death were caused by the DPT vaccination, and that there is a not a preponderance of evidence that they were caused by some unrelated agent or condition.

## FINDINGS OF FACT

The following uncontroverted facts are supported by the record and are adopted by the undersigned.

Gaylene Lanora Anderson [hereafter "Gaylene"] was born on September 20, 1980, the second child of the petitioner, Deborah Rochester Anderson, and Rickey T. Anderson.[5] She was born after a 40 week gestation period and a spontaneous vaginal delivery. At birth she weighed 8 pounds, 3.5 ounces and measured 20 inches in length.[6] Gaylene's Apgar tests, which measure heart rate, respiration, muscle tone, responsiveness to stimulation, and skin color, and which are generally conducted exactly at one minute and five minutes after birth,[7] resulted in scores of 8 and 8, respectively. A perfect score is 10. Her overall condition at birth was described as good.[8]

After her discharge from the hospital, Gaylene was seen by her pediatrician, Dr. Fred Mansubi, for eight well-baby check-ups.[9] Except for treating Gaylene for a running nose, sneezing, fever and colic on the third, sixth and seventh visits, respectively, Dr. Mansubi found her generally in good health and developing well.[10] From her birth until she was 5 months of age, Gaylene was essentially a very healthy, active and happy baby, who ate and slept well, and always smiled and laughed.[11] Her only significant illness during this period of time was a three-day episode of colic which occurred around December 19, 1980.[12]

On February 13, 1981, at 5 months of age, Gaylene received her DPT vaccination in San Jose, California. It was her third DPT shot, administered by Dr. Mansubi.[13] Upon physical examination, Gaylene was happy, smiling, and normal.[14] The DPT inoculation was administered at approximately 11:00 a.m.[15]

At about 11:30 a.m., Gaylene appeared dazed, just lying in her infant seat with her eyes open. She was not crying, laughing, or talking. She was limp and seemed sick.[16] Petitioner recalled that this behavior was very uncharacteristic for Gaylene, who was usually animated, active and happy.[17] She developed a fever of approximately 101°.[18] Sometime after 1:00 p.m., Gaylene was given some aspirin and took a

---

5. Transcript of hearing held on July 13, 1989 at 42 [hereafter cited as "tr. ___"]; hearing exhibits 1, 7 [hereafter cited as "ex. ___"].

6. Ex. 1.

7. *The Merck Manual of Diagnosis and Therapy* at 986 (13th ed. 1977).

8. Ex. 1.

9. These visits occurred on September 25, 1980, October 6, 1980, October 29, 1980, November 13, 1980, November 24, 1980, December 9, 1980, December 19, 1980, and December 29, 1980. Ex. 8.

10. Ex. 8; tr. 21.

11. Tr. 43–44, 48, 68–69; ex. 9 (Deborah Anderson Rochester deposition [hereafter "DAR depo."] at 28–30) (Rickey T. Anderson deposition [hereafter "RTA depo."] at 25–27). *See also* ex. 10(a)–10(h).

12. Tr. 21, 46; ex. 8.

13. Tr. 26, 45; ex. 6, 8, 9 (DAR depo. at 32–33). In ex. 5, Dr. Mansubi affirms on December 15, 1988, that he administered only two shots. However, his own medical records (ex. 8) conclusively establish that three shots were in fact administered on November 24, 1980, December 29, 1980, and February 13, 1981. *See also* Dr. Mansubi's record of immunizations which is attached to the initial petition. It corroborates that three DPT shots were administered to Gaylene. The petitioner specifically recalls having observed Dr. Mansubi make those entries on the immunization record. Ex. 9 (DAR depo. at 28, 33).

14. Ex. 8.

15. Ex. 9 (DAR depo. at 28); tr. 45.

16. Tr. 47; *see also* ex. 9 (DAR depo. at 34, 69).

17. Tr. 48, 61.

18. Ex. 9 (DAR depo. at 40).

two hour nap.[19] At about 3:00 p.m., she awoke and started screaming a painful, screeching cry.[20] It was a high, piercing, continual crying.[21] Petitioner had never heard Gaylene scream like that before. She was unable to console Gaylene or to make her stop crying.[22] Gaylene would neither eat nor take her formula, and would only drink small amounts of water. Gaylene would scream and stiffen up whenever any pressure was put upon her stomach.[23] Her fever continued, and she would only sleep for periods of 20 minutes at a time. This behavior persisted until the evening of the following day, February 14, 1989.[24] She appeared to be very white and pale.[25] At approximately 11:30 p.m., Gaylene went to sleep for the last time. This was the longest period of time that she slept since the two-hour nap on the previous day.[26] Gaylene was last seen alive at 2:00 a.m. on the morning of February 15, 1981;[27] at approximately 8:00 a.m., she was discovered dead in her crib.[28] She was stiff and appeared blue.[29]

The pathologist who performed the autopsy upon Gaylene's body found upon visual examination that the trachea and bronchi contained mucous and that the lungs, liver and spleen were congested. Upon microscopic examination, he also found congestion in the adrenals and the brain. His diagnosis was that Gaylene suffered from interstitial pneumonia, pulmonary edema, and pulmonary and visceral congestion.

Based upon these findings, he concluded that the cause of her death was sudden infant death,[30] commonly known as sudden infant death syndrome [hereafter "SIDS"].[31]

At the hearing, this opinion was strongly challenged by both Dr. Fred Mansubi and Dr. Kevin Geraghty, petitioner's expert witness. Dr. Mansubi observed that, prior to receiving the DPT shots, Gaylene was physically, mentally and developmentally normal. In his opinion, the DPT shot was causally related to her death.[32] Dr. Geraghty, who is board certified in both pediatrics and allergy and immunology, has developed a special expertise on the subject of DPT and its relationship with SIDS.[33] He reviewed all of Gaylene's medical, hospital and autopsy records, as well as petitioner's pre-natal records and the depositions of petitioner and her husband.[34] Based upon his review, Dr. Geraghty found that petitioner had a regular uncomplicated delivery, and that Gaylene was a normal, healthy child.[35] He did suggest that Gaylene did show some early signs of allergy, *i.e.*, her repeated infections and the improvement of her colic when her milk-based formula was changed to a soybean product.[36] Nonetheless, in Dr. Geraghty's opinion, Gaylene died from complications associated with administration of the third DPT vaccine.[37]

Dr. Geraghty based his opinion on several factors. (1) It is highly probable that

19. Tr. 48; ex. 9 (DAR depo. at 71).

20. Tr. 49.

21. Ex. 9 (DAR depo. at 36).

22. Tr. 49; ex. 9 (DAR depo. at 36).

23. Tr. 60–61; ex. 9 (DAR depo. at 43).

24. Tr. 50, 52, 59, 63, 70; ex. 9 (DAR depo. at 37, 78–79) (RTA depo. at 27–29).

25. Tr. 51, 70.

26. Tr. 52. 58; ex. 9 (DAR depo. at 46) (RTA depo. at 31).

27. Ex. 9 (DAR depo. at 49).

28. Tr. 53, 55; ex. 9 (RTA depo. at 31).

29. Ex. 9 (RTA depo. at 31). *See also* ex. 9 (DAR depo. at 47).

30. Ex. 4; *see also* ex. 3, 7.

31. "The completely unexpected and unexplained death of an apparently well, or virtually well, infant.... The cause is uncertain." *The Merck Manual of Diagnosis and Therapy* at 1049 (13th ed. 1977).

32. Ex. 5.

33. Ex. 13.

34. Tr. 20–26.

35. Tr. 21.

36. Tr. 21–22.

37. Tr. 26–27.

Gaylene was inoculated with an unusually toxic batch of DPT, which was originally rejected by the Food and Drug Administration, but was later recycled by the vaccine manufacturer. (2) Gaylene's symptoms following the DPT shot were consistent with adverse reactions associated with pertussis endotoxin.[38] (3) The time of her death coincided with deaths caused by DPT. (4) Because she was not a healthy child on the two days preceding her death, Gaylene's symptoms were inconsistent with a SIDS profile. She suffered an insidious progression of dramatic symptoms, which began one-half hour after the administration of the DPT vaccine. (5) The autopsy findings were consistent with deaths due to endotoxins, i.e., endotoxins usually affect the lungs, liver and spleen. (6) The autopsy diagnoses of pneumonia, pulmonary edema, and congestion were not only consistent with an HHC, but with an encephalopathy as well. (7) SIDS is an idiopathic label physicians apply when the cause of death is unknown; SIDS is not itself a true causative agent. Finally, (8) there was no alternative cause of death suggested by Gaylene's medical history, or that of her parents.[39]

## DISCUSSION

The Act requires the petitioner to establish the following elements by a preponderance of the evidence [40] before compensation can be awarded: (1) that Gaylene received a vaccine listed in the Vaccine Injury Table [hereafter "Table"] (2) in the United States; (3) that she sustained an injury listed on the Table within the specified time limits; (4) that she died from the administration of the vaccine; and (5) that she has not previously collected a judgment or settlement in a prior or pending civil action.[41] The petition must be brought by the legal representative of the decedent.[42] In addition to the affirmative burden placed on the petitioner, the petition must fail if a preponderance of the evidence establishes that the claimed injury is due to some factors unrelated to the vaccine.[43]

Section 300aa–14(a) lists DPT as one of the covered vaccines. The Table lists encephalopathy which occurs within three days as a compensable injury. Further, it covers an HHC if the symptoms occur within three days. If petitioner can successfully fit the facts of her case within the four corners of the Table, the Vaccine Act essentially creates a rebuttable presumption of causation.[44]

Once petitioner can navigate past the threshold of entitlement to compensation, the estate can be awarded the $250,000 death benefit [45] and reasonable attorneys' fees and other costs.[46] Since this case is a retroactive case,[47] petitioner's award for attorneys' fees and costs is expressly limited to $30,000.[48]

In considering the testimony presented at the hearing, the undersigned found all petitioner's witnesses both credible and convincing. Petitioner is pursuing two theories of causation to sustain her claim for compensation. She claims that Gaylene suffered an encephalopathy and an HHC.

38. An endotoxin is a poison associated with the outer membranes of certain gram-negative bacteria, such as pertussis. Endotoxins are not secreted and are released only when the cells are disrupted. *Dorland's Illustrated Medical Dictionary* at 557 (27th ed. 1988). Endotoxins are pyrogenic and increase capillary permeability. *The Sloane–Dorland Annotated Medical–Legal Dictionary* at 253 (1987).

39. Tr. 27–40. *See generally,* tr. 20–21, 43, 48, 64; ex. 1, 2, 5, 8, 9 (DAR depo. at 28–29, 89–90, 95, 97–99, 101–102) (RTA depo. at 11–12, 21–22, 25–26).

40. § 300aa–13(a)(1).

41. § 300aa–11(c)(1).

42. § 300aa–11(b)(1)(A).

43. § 300aa–13(a)(1)(B).

44. *See* H.R. Rep. 908, 99th Cong., 2d Sess. 15, *reprinted in* 1986 U.S.Code Cong. & Admin. News 6287, 6344, 6356.

45. § 300aa–15(a)(2).

46. § 300aa–15(e).

47. A retroactive case is one in which the vaccine was administered before October 1, 1988, the effective date of the Act.

48. § 300aa–15(b).

The undersigned finds that petitioner's evidence satisfies the Table criteria for both injuries.

■ Upon close examination of the record, there is a preponderance of credible evidence that Gaylene suffered an encephalopathy within three days of the administration of the DPT vaccination. Prior to the DPT shot, Gaylene was a normal, healthy child.[49] Within one-half hour after receiving the shot, Gaylene began to manifest signs of neurological distress. She was dazed, lethargic, limp, appeared sick and was not behaving like her normal self.[50] Sometime later, she developed a 101° fever.[51] Within four hours after the inoculation, Gaylene began a lengthy episode of high pitched and unusual screaming and persistent, inconsolable crying.[52] For the next 32 hours, Gaylene refused to eat or drink, or to sleep for periods longer than 20 minutes.[53] She died within 45 hours of the DPT vaccination. Dr. Geraghty testified that Gaylene's symptoms, the time of her death, and her post-mortem signs were consistent with an encephalopathy.[54]

In the interpretive aids to the Table, § 300aa–14(b)(3) defines encephalopathy as:

any significant acquired abnormality of, or injury to, or impairment of function of the brain. Among the frequent manifestations of encephalopathy are focal and diffuse neurologic signs.... [Such] signs and symptoms of encephalopathy ... may result in various degrees of permanent impairment. Signs and symptoms such as high pitched and unusual screaming, [and] persistent inconsolable crying ... are compatible with an encephalopathy, but in and of themselves are not conclusive evidence of encephalopathy.... If at the time a judgment is entered ... it is not possible to determine the cause, by a preponderance of the evidence, the encephalopathy shall be considered to be a condition set forth in the table....

Based upon the foregoing provision and the evidence in the entire medical record, the undersigned concludes that Gaylene Anderson suffered an encephalopathy as set forth in the Table.

■ The preponderance of the evidence in the record also supports the conclusion that Gaylene suffered an HHC which resulted in death within three days of the DPT vaccine. Within one half-hour after the administration of the DPT shot, Gaylene suffered a decrease or loss of muscle tone and was unresponsive to any environmental stimuli.[55] On that day as well as the next, Gaylene lost skin color and appeared pale.[56] In Dr. Geraghty's opinion, Gaylene's symptoms were consistent with an HHC or shock collapse. He also concluded that the autopsy findings of pulmonary edema and congestion evidenced that Gaylene's death resulted from toxic shock.[57] In § 300aa–14(b)(1), the Act provides that:

a shock-collapse or a hypotonic-hyporesponsive collapse may be evidenced by indicia or symptoms such as decrease or loss of muscle tone, ... loss of color or turning pale white or blue, unresponsiveness to environmental stimuli, [or] loss of consciousness....

Applying the statutory interpretive provision to the evidence in this case, the undersigned concludes that Gaylene Anderson also sustained an HHC as set forth in the Table.

■ Further, the record is devoid of evidence proving by a preponderance that some other agent caused Gaylene's death. The only potential alternative cause suggested by the medical records was the

---

49. Ex. 1, 8, 9 (DAR depo. at 28–29); tr. 21, 34–44, 48, 68–69.

50. Tr. 47.

51. Ex. 9 (DAR depo. at 40).

52. Tr. 49; ex. 9 (DAR depo. at 36).

53. Tr. 50, 52, 59, 63, 70; ex. 9 (DAR depo. at 37, 78–79) (RTA depo. at 27–29).

54. Tr. 31, 33, 40.

55. Tr. 47.

56. Tr. 47, 70.

57. Tr. 27, 33, 38–39.

**386**

SIDS diagnosis of the pathologist.[58] As explained by Dr. Geraghty, based upon an evaluation of the medical records and the parental history of symptoms observed immediately after the DPT vaccine, Gaylene's symptoms do not suggest SIDS death.[59] Gaylene was not well on the two days immediately preceding her death. She was clearly suffering from some serious physical disturbance.[60] Neither indicator is consistent with SIDS' characteristics.

Moreover, the Act prohibits the Court from denying compensation on the basis that SIDS was an alternative cause of Gaylene's injuries and death. The statute expressly precludes consideration of "any idiopathic, unexplained, unknown, hypothetical, or undocumentable cause, factor, injury, illness, or condition ..."[61] as an alternative cause. Accordingly, the undersigned concludes that there is insufficient evidence to support any alternative cause of Gaylene's injuries or death.

The other essential jurisdictional facts required by the Act are also conclusively established. Gaylene received her DPT vaccination in San Jose, California, the United States on February 13, 1981.[62] She died on February 15, 1981, as a direct result of the administration of the DPT vaccine.[63] She has not previously collected a judgment or settlement in a prior or pending civil action.[64] Having been duly appointed administrator of Gaylene's estate by a court of competent jurisdiction,[65] the petitioner has established the requisite capacity to bring this compensation action.

For the foregoing reasons, the undersigned concludes that petitioner's eligibility for compensation is supported by a preponderance of the evidence. Thus petitioner is entitled under § 300aa–15(a)(2) to an award of $250,000 for the estate of Gaylene L. Anderson.

In his application for attorneys' fees and costs, Rodney A. Klein claimed expending 112.3 hours on this case and seeks an hourly rate of $250 for a total of $28,075. However, his documented hours total 123.5 hours. After an examination of his application for fees, the undersigned finds Mr. Klein's expenditure of 112.3 hours of time to be reasonable for the prosecution of this compensation action as well as a prior civil action. Petitioner submitted three statements [66] which corroborate that $250 is a reasonable hourly rate in the Sacramento, California legal community for an attorney of Mr. Klein's experience and abilities.[67]

In addition, Mr. Klein was assisted in this case by Michael R. Skow, an associate with less than two years experience, and Sherrill Linker and Susi Thompson, legal assistants. Mr. Skow claims to have spent 24.05 hours on the compensation action, but can only document 20.05 hours. The $100 hourly rate sought for his services is a reasonable rate for a young lawyer in the relatively expensive northern California area. Ms. Linker claims to have spent 84.5 hours on the prior civil action and seeks the hourly rate of $60. The undersigned finds the rate to be reasonable but finds that only 78.5 hours can be documented on the itemized statement. Her services consisted of researching medical literature, collecting the medical records, and drafting pleadings and responses to discovery requests. Ms.

**58.** Ex. 4.

**59.** Tr. 33–35. *See* n. 30, *supra.*

**60.** *See* findings made on 5–6, *supra. See also* n. 38, *supra.*

**61.** § 300aa–13(a)(2)(A).

**62.** Tr. 26, 45; ex. 5, 6, 8, 9 (DAR depo. at 32–33).

**63.** Tr. 26–27, 53; ex. 7.

**64.** Ex. 12.

**65.** Ex. 11.

**66.** Ex. 14 contains letters from Associate Justice DeCristoforo of the California Court of Appeals, Judge Virga of the California Superior Court, and attorney Gary B. Callahan, who are all personally acquainted with Rodney A. Klein and with the prevailing attorneys' fees and rates in the Sacramento community.

**67.** *See e.g. Lawyers' Billing Rates Are Rising as Firms try to cope with Costs,* Wall St.J., July 28, 1989, at B4 (California lawyers have the highest average billing rates in the country); *The Lawyer's Almanac 1989,* Billing Rates at 47 Major U.S. Law Firms at 118, 120 (partner hours in Los Angeles firms ranging from $250–$350, San Francisco $185–$255).

Thompson claims 30.4 hours at a $20 hourly rate. The undersigned finds that her services were primarily of a secretarial and clerical nature and should be considered as normal overhead office costs included within the attorneys' fee rates. Thus no allowance should be given for any of her services.

Similarly, the undersigned finds the itemized statement of costs reasonable and appropriate. However, § 300aa–15(b) limits any award for both attorneys' fees and costs to $30,000 in this case. Accordingly, it is recommended that the Court's judgment include the additional sums of $27,-870.55 for Mr. Klein's fees and $2,129.45 for his costs.[68]

With regard to the Secretary's inactive role in this proceeding, it is recommended that the Court find the Secretary in default in accordance with Vaccine Rule 55. As more fully discussed in the July 24, 1989 Order in this case, the Secretary has been given ample formal notice of the hearing and every status conference. He has been given sufficient opportunities to actively participate, but has failed or refused to do so. By failing to timely answer either of petitioner's amended petitions, the Secretary has committed acts of omission which entitle this petitioner to a judgment by default. By abandoning this litigation, the Secretary has waived his rights to further participate in this case.

In view of the foregoing, the undersigned recommends to the Court that petitioner be granted judgment for $280,000.

---

**68.** Of course, the provision of § 300aa–15(f)(4)(B) mandating payment of "compensation to a petitioner" in retroactive cases be made in four annual installments does not apply to Mr. Klein's attorney fees. Although § 300aa–15(b) includes attorneys' fees with the awards for pain and suffering and lost wages as a permissible expenditure under the $30,000 umbrella in retroactive cases, to read "compensation to a petitioner" for the purposes of § 300aa–15(f)(4)(B) to include attorneys' fees strains statutory logic. As incentive for attorneys to accept Vaccine cases, Congress included

a fee provision. Congress' vision of fees and costs as distinct from "compensation" is further evidenced since attorney's fees are available even where no compensation is awarded. § 300aa–15(e)(1). In addition, the statute explicitly forbids attorneys from engaging in alternative fee arrangements. § 300aa–15(e)(3). Finally, any other construction would unfairly penalize attorneys in retroactive cases, thereby discouraging them from accepting those petitioners. Such an enigmatic result clearly was not contemplated by the statute.