Danyelle R. **CARRAGGIO** and Mark Anderson, as parents and next friends of Jason Lucas Anderson, deceased, Petitioners,

v.

**SECRETARY OF THE DEPARTMENT OF HEALTH AND HUMAN SERVICES, Respondent.**

No. 93–438V.

United States Court of Federal Claims.

May 21, 1997.

Ronald C. Homer, Boston, MA, for petitioners.

Elizabeth F. Kroop, Washington, DC, with whom was Assistant Attorney General Frank W. Hunger, for the respondent.

## OPINION

YOCK, Judge.

This case comes before the Court on the petitioners' Motion for Review of Special Master Elizabeth Wright's Decision, *Carraggio v. Secretary of Dep't of Health & Human Resources*, No. 93–438V, 1997 WL 74694 (Fed.Cl.Sp.Mstr. January 31, 1997) (the Decision), which denied the petitioners' claim for compensation under the National Childhood Vaccine Injury Act, 42 U.S.C. 300aa–1– 300aa–34 (1994) (the Vaccine Act or Vaccine Program). After thorough consideration of the entire record in this matter, including the parties' respective submissions and the transcript from the hearing before the special master, the petitioners' Motion for Review is denied, and the Decision of the special master is affirmed.

*Factual Background*

Jason Lucas Anderson was born on June 30, 1991. At Jason's fifteen-day check-up, Dr. Michael A. Donlan, Jason's pediatrician, noted that Jason was a "super baby." Petition for Vaccine Compensation (Pet. for V. Comp.), filed July 14, 1993, Ex. 5 at 2. According to Ms. Danyelle Robinson (previously Carraggio), Jason's mother, during the time period immediately prior to his vaccinations, Jason was an active two-month-old baby who could smile, giggle, grab for objects, and grasp fingers. A typical day for Jason consisted of waking at 6:00 a.m., nursing, then falling back to sleep until about 9:00 a.m, when he again would nurse. After the 9:00 a.m. feeding, Jason would "play" until about 10:00 a.m. and then go back to sleep until noon, when he would wake up, nurse, and play. Jason took his afternoon nap around 1:00 or 1:30 p.m. and usually nursed again at 3:00 p.m. and at 6:00 p.m. Jason went to sleep in the evening between 11:00 p.m. and 12:00 midnight and would wake up at around 3:00 a.m. to be fed.

On August 30, 1991, Ms. Robinson took Jason to Dr. Donlan's office for his two-month well-baby check-up. During that check-up, Jason received his first DPT, oral polio, and hemophilus influenza type b (HIB) vaccinations. Ms. Robinson and Jason arrived home from Dr. Donlan's office around 4:30 p.m. According to Ms. Robinson, Jason was "extremely fussy." Tr. at 64. Ms. Robinson carried Jason around in order to comfort him until he fell asleep, but when she would lay him down he would only sleep for about five to ten minutes. Jason did not eat at 6:00 p.m., as he normally would, and did not play that evening but was irritable and cried continuously.

Ms. Robinson planned to go out that evening with a friend, Ms. Tracee Stout, and Mrs. Cleo Meckle, Ms. Robinson's mother, was going to babysit Jason. Ms. Robinson dropped Jason off at her mother's house around 8:30 p.m. and informed her mother that Jason was irritable because of his vaccinations. During the time that Mrs. Meckle

babysat, Jason was fussy and it took a great deal of effort to feed him his bottle. According to Mrs. Meckle, Jason was not his usual responsive self, did not coo or smile, and appeared to be swollen or bloated and pale in the upper part of his body. After much coaxing, Jason drank most of his two and a half-ounce bottle. At about 9:45 p.m., Jason fell asleep, and Ms. Robinson picked him up from her mother's house around 2:30 a.m. According to Ms. Robinson, Jason did not awaken when she put his coat on or put him in the car, and he slept in the car during the ride to Ms. Stout's house, where they were going to spend the night. Jason did not wake up for his 3:00 a.m. feeding.

On August 31, the day after his vaccinations, Jason woke up at 6:00 am. At that time, Ms. Robinson fed Jason, and he fell asleep until 9:30 or 10:00 a.m. When he woke up, Jason did not want to eat or play like he normally did at this time. For several hours, Jason wanted to be held by Ms. Robinson and would only sleep for periods of five to ten minutes. Jason did not eat again until about 1:00 p.m. and then fell asleep until about 4:30 or 5:00 p.m. During the time period after his DPT vaccination, Jason never exhibited a fever.[1] At 1:30 or 2:00 p.m., Ms. Robinson and Ms. Stout left their six children, including Jason, with the babysitter, Heather Ricks, at Ms. Stout's house. Upon leaving, Ms. Robinson told Ms. Ricks that Jason had been fussy lately, but she did not mention his recent vaccinations.

During the time period that Ms. Ricks was babysitting, Jason was fussy off and on and would only drink a little out of his bottle each time she tried to feed him. After feeding Jason, Ms. Ricks would lay him down to sleep but he would only do so for about ten minutes at a time and then would wake up crying. Jason was responsive to attention given to him and seemed comforted when Ms. Ricks picked him up. According to Ms. Ricks, Jason smiled during the evening. Ms. Ricks testified that Jason did not exhibit any

swelling, fever, or trouble breathing, never lost consciousness, and did not appear limp. Around 4:30 or 5:00 p.m., Ms. Robinson telephoned Ms. Ricks to check on the children, and she was informed that Jason was awake and eating. At some time during the evening, Ms. Ricks laid Jason down on a water bed face down on his stomach and placed a pillow on either side of him. Ms. Ricks checked on Jason about every fifteen minutes. At around 8:00 p.m., during one of her routine check-ups of Jason, Ms. Ricks found him in the same position as she had left him earlier. He was not breathing and appeared to be pale and white. Ms. Ricks picked Jason up, felt no pulse, started to perform cardio-pulmonary resuscitation (CPR),[2] and called 911. During the 911 call, Ms. Stout again called to check in and was informed by Ms. Ricks that something was wrong with the baby. Ms. Stout and Ms. Robinson immediately drove to Ms. Stout's house.[3] After the 911 call, the paramedics arrived approximately ten minutes later, attempted CPR, and transported Jason to the hospital where he was pronounced dead.

Jason's death certificate lists sudden infant death syndrome (SIDS) as the cause of death. A coroner's investigative report, dated August 31, 1991, indicates that "[n]o recent illness" was reported and that Jason was found on a water bed. On September 3, 1991, Dr. George R. Lindholm performed an autopsy on Jason. While Dr. Lindholm considered SIDS as the cause of death, he felt "compelled to designate the death as asphyxia due to airway occlusion (laid to rest face down on a waterbed)." Autopsy Report at 1. In addition, Dr. Lindholm found petechiae, i.e., little ruptured blood vessels, on Jason's heart and lungs, which are a sign of asphyxiation. A Vaccine Adverse Event Reporting System (VAERS) report was filed, which reported that "[m]other state[d] baby did not seem to have had any reactions to the childhood immunizations." Pet. for V. Comp. Ex. 7. According to Ms. Robinson, she thought

---

1. Ms. Stout stated that Jason was a little fussy during the day but did not seem swollen or bloated.

2. Jason did not respond to Ms. Ricks' attempts to revive him.

3. Upon arriving home, Ms. Stout saw Jason being attended to by the paramedics. According to Ms. Stout, Jason looked puffier than normal and there was a darker coloration around his chest.

Jason's reactions to the vaccinations were normal because her older son had similar reactions after his DPT vaccination, *i.e.*, he was irritable, sleepy, unresponsive, and not feeding well.

On July 14, 1993, Ms. Robinson and Mr. Mark Anderson, Jason's natural father, filed a petition for compensation in the United States Court of Federal Claims, as parents and next friends of their son, Jason, as a result of his death that the petitioners contend was caused by his DPT vaccination. In the petition, the petitioners alleged that Jason experienced a hypotensive-hyporesponsive episode (HHE), *see* 42 U.S.C. 300aa–14(b)(1),[4] within the table period established pursuant to the Vaccine Act, and that his death occurred as the proximate and direct result of the DPT vaccination that he received on August 30, 1991. The respondent (the Government or the Secretary of the Department of Health and Human Services) countered that the petitioners have failed to prove that Jason suffered the onset of an HHE or any other ontable injury, within the time periods required by the Vaccine Act, of which their son's death was a sequela. In the alternative, the respondent contends that the petitioners have failed to prove that the DPT was, in fact, the cause of Jason's death.

On April 18, 1996, the special master held an evidentiary hearing on factual issues, at which time Ms. Robinson and her mother, Mrs. Meckle, testified about Jason's changes in behavior prior to and after his August 30, 1991 DPT vaccination. Ms. Stout and Ms. Ricks did not testify at the hearing, but their depositions were taken and filed in this case. In addition, the special master did not receive oral testimony from any medical experts, but depositions and expert reports were obtained from several doctors regarding the circumstances of Jason's death.

On behalf of the petitioners, Mark R. Geier, M.D., Ph.D., filed an expert report in which he concluded that Jason suffered an HHE, and ultimately died, as a result of his DPT vaccination. It was Dr. Geier's opinion that

Jason was observed to have most if not all of the symptoms described in the aids to interpretation of the Vaccine Compensation Act table under hypotensive hyporesponsive episode. These included that he was less responsive to his environment, had prolonged sleeping, was hard to arouse and had a lessened state of consciousness. It also included loss of muscle tone and cardiac and respiratory arrest leading to his death.

Pet. for V. Comp. Ex. 16 at 7. In addition, Dr. Geier noted that Jason's DPT vaccination was from an "exceptionally reactogentic lot of DPT and under CDC's previous designations would have been called a 'hot lot' " because at least fifty adverse reaction reports were filed for that lot. *Id.* Finally, in Dr. Geier's opinion, there was no "provable alternate cause for Jason's death other than the DPT shot that he received on 8/30/91." *Id.* at 8. Dr. Geier filed a supplemental affidavit after reviewing the deposition testimony of Ms. Ricks, Ms. Stout, and Drs. Donlan, Lindholm, and Graham S. McConnell, and found that this new information did not change his opinion that the DPT vaccination caused Jason's death.

On behalf of the respondent, Mary Anne Guggenheim, M.D., a pediatric neurologist, filed a report concluding that "Jason Anderson died from SIDS, a tragic and unexpected event of unknown cause, unrelated to his prior immunization other than the temporal association." Report of Dr. Guggenheim at 1. More specifically, Dr. Guggenheim stated that:

As best I can reconcile the testimony of the four adults who were with Jason in the 28 hours preceding his death it appears that he was more fussy than usual, and had deviated from his usual eating/sleeping routine. The latter must be put in the context of his being moved first to his grandmother's house and then to Tracee's house during this time period. The grandmother describes "swelling" and diminished responsiveness ("couldn't get him to smile"; she "just thought he was tired").

---

4. HHE, hypotonic-hyporesponsive collapse (HHC), and shock collapse are used synonymously under the Vaccine Act.

No other observers mention any swelling and no evidence of abnormal fluid retention was found on autopsy. None of the four observers describe anything more than an irritable and fussy child who was not on his regular schedule. He was never unconscious. He continued to take feedings. None of the caretakers had concerns that caused them to seek medical help and no special concerns were voiced by the mother when she left him with the babysitter. Although Dr. Geier has interpreted the situation as diagnostic of HHE, the descriptions given by the four caretakers are not at all like what has been described in the medial literature about this condition.

The clinical events and autopsy are characteristic of SIDS. It is my opinion that this was indeed the cause of Jason Anderson's death. It occurred approximately 28 hours after he received routine immunizations. Afterwards, he was somewhat fussy but did not manifest behaviors of either HHE or acute encephalopathy. There is no evidence to suggest that either SIDS in general nor Jason's death in particular was caused by the immunizations he received.

*Id.* at 3–4.

In addition to the expert reports, Drs. Michael A. Donlan, George R. Lindholm, and Graham S. McConnell gave deposition testimony in this case. First, Dr. Donlan, Jason's pediatrician, who is board certified in medical genetics, testified. Dr. Donlan stated that there are normal reactions to a DPT shot, which include fussiness, irritability, a low-grade temperature, eating less, disruptive sleeping patterns, and possible swelling at the injection site. Next, Dr. Donlan stated that the serious reactions to the pertussis portion of the DPT vaccination that he was aware of were a "hyper-responsive state, which is unusual and excessive irritability; a hypo-responsive state where kids kind of act goo-goo eyed and kind of out of it; and children who have a seizure within 72 hours with or without a fever." Dep. of Dr. Donlan at 14. Dr. Donlan signed Jason's death certificate with the cause of death listed as

SIDS and believed that the findings surrounding Jason's death were most compatible with SIDS.[5]

Next, Dr. Lindholm, the pathologist who performed the autopsy on Jason, testified. Dr. Lindholm testified that during the autopsy he found "small petechial hemorrhages present, that is, little slender hemorrhages present on the lungs and * * * on the heart," which were consistent with SIDS or other asphyxia. Dep. of Dr. Lindholm at 11. In Dr. Lindholm's opinion, Jason died from asphyxia by smothering on a water bed and "it would be improbable or unlikely that DPT plays a role in this death" because Jason

did not show any evidence of cerebral edema, that is the swollen brain. There was no evidence of hip prominent occlusion or prominent application of cerebellar tonsil to the brain, no indication, if you like, of cerebral edema. There was no cerebral hemorrhages, which one may see an encephalitis type of picture, that is, weepy vessels, which would then see that redness. As well as microscopically there was no evidence whatsoever of what I would call cerebral edema, though that is somewhat subjective the way people read slides on that, tie findings that you're looking for.

But there was certainly no evidence of an inflammatory kind of reaction as one might suspect, if I can use the loose term, allergic type of abnormality. I did not see encephalitis.

*Id.* at 28–29. In addition, Dr. Lindholm stated that "in the absence of any cerebral edema or blood pressure abnormalities, one would be way out on a limb to say that DPT is necessarily involved here." *Id.* at 29. Next, Dr. Lindholm noted that SIDS is a relatively common occurrence, which usually occurs by coincidence during the same time period that infants are receiving vaccinations. Dr. Lindholm also testified that, while he did not object to leaving Jason's cause of death on his death certificate as SIDS, he later sought to change the cause of death from SIDS to "undetermined" because of Jason's placement on the water bed. Moreover, contrary to Mrs. Meckle's statements, Dr. Lin-

5. In a letter to Ms. Robinson on October 30, 1991, after Jason's death, Dr. Donlan expressed his opinion that there was no relationship between the water bed and Jason's death.

dholm did not note any swelling in Jason's neck or extremities during the autopsy. Finally, Dr. Lindholm testified to a reasonable degree of medical probability that there was no association between the DPT shot and Jason's death.

Finally, the parties took the deposition of Dr. McConnell, the Spokane County Coroner at the time of Jason's death. Ms. Robinson contacted Dr. McConnell numerous times because she wanted to change the cause of death listed on Jason's death certificate from "SIDS" to "undetermined," but Dr. McConnell refused to do so.

On January 31, 1997, the special master issued a decision denying compensation to the petitioners. Specifically, the special master found Dr. Guggenheim's opinion to be more credible than Dr. Geier's opinion and, therefore, held that the facts of this case do not support the petitioners' contention that Jason suffered the onset of an on-table HHE within the seventy-two-hour time period after his DPT vaccination. In addition, the special master relied on two decisions of the United States Court of Appeals for the Federal Circuit, *Hellebrand v. Secretary of the Dep't of Health & Human Servs.*, 999 F.2d 1565 (Fed. Cir.1993) and *Hodges v. Secretary of the Dep't of Health & Human Servs.*, 9 F.3d 958 (Fed.Cir.1993), for the proposition that Jason's on-table HHE must be proven to have occurred prior to his death in order for the petitioners to recover for a table injury. The special master found that the petitioners failed to prove, by a preponderance of the evidence, that Jason's death was the sequela of an on-table HHE. On February 28, 1997, the petitioners timely moved for review by the United States Court of Federal Claims. According to the petitioners, the special master's holding that Jason's symptoms of HHE had to precede or to have occurred prior to the agonal event reduced the seventy-two-hour on-table time period afforded to the petitioners under the Vaccine Act and, therefore, was arbitrary, capricious, and an error of law.

### Discussion

 The Vaccine Act provides that:

[T]he United States Court of Federal Claims shall have jurisdiction to undertake a review of the record of the proceedings [before the special master] and may thereafter—

(A) uphold the findings of fact and conclusions of law of the special master and sustain the special master's decision,

(B) set aside any findings of fact or conclusion of law of the special master found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and issue its own findings of fact and conclusions of law, or

(C) remand the petition to the special master for further action in accordance with the court's direction.

42 U.S.C. 300aa–12(e)(2). Thus, the Vaccine Act contemplates three distinct levels of review. "Fact findings are reviewed under the arbitrary and capricious standard. Legal questions are reviewed under the 'not in accordance with law' standard, and discretionary rulings are reviewed under the abuse of discretion standard." *Perreira v. Secretary of the Dep't of Health & Human Servs.*, 27 Fed. Cl. 29, 32 (1992), *aff'd*, 33 F.3d 1375 (Fed.Cir.1994); *see also Staples v. Secretary of the Dep't of Health & Human Servs.*, 30 Fed. Cl. 348, 353–54 (1994). The arbitrary and capricious standard is a narrow one. This Court will not overturn a decision of the special master unless there was a clear error of judgment. *Johnston v. Secretary of the Dep't of Health & Human Servs.*, 22 Cl.Ct. 75, 76 (1990).

 The Court reviews questions of statutory interpretation *de novo*. *Hossack v. Secretary of the Dep't of Health & Human Servs.*, 32 Fed. Cl. 769, 773 (1995). Despite this Court's *de novo* review, "[w]hen examining issues of law in vaccine cases, 'recognition is to be given to the special master's expertise in the development of these novel procedures. A decision on issues of law should be overturned only when error is unmistakenly clear.'" *O'Connor v. Secretary of Dep't of Health & Human Servs.*, 24 Cl. Ct. 428, 429 (1991) (quoting *Munn v. Secretary of the Dep't of Health & Human Servs.*, 21 Cl.Ct. 345, 348 (1990)), *aff'd*, 975 F.2d 868 (Fed.Cir. 1992); *see also Johnson v. Secretary of*

*Health & Human Servs.*, 33 Fed. Cl. 712, 720 (1995), *aff'd*, 99 F.3d 1160 (Fed.Cir.1996); *Song v. Secretary of the Dept. of Health & Human Servs.*, 31 Fed. Cl. 61, 67, *aff'd*, 41 F.3d 1520 (Fed.Cir.1994). Therefore, this Court will overturn the special master's Decision only if the petitioners can demonstrate that there was clear error in the Decision.

In their motion for review, the petitioners submit the following objection to the special master's Decision:

> *The Special Master ruled that Jason's symptoms of HHE had to "precede" or "have occurred prior" to the "agonal event." In so doing, the Special Master has dramatically reduced the 72 hour Table time period afforded to petitioners to exhibit symptoms (§ 300aa–14). To do so was arbitrary and an abuse of discretion under 300aa–12(e)(2)(B). It was an error of law under 300aa12(e)(2)(A).*

Pets.' Mot. for Rev. at 7. According to the petitioners, the facts relevant to this case and the applicable case law establish, by a preponderance of the evidence, that Jason suffered an HHE and that his death was a sequela of that HHE. Moreover, the petitioners contend that the respondent has not rebutted the petitioners' evidence because SIDS is not a factor unrelated to the administration of the vaccine. The central issue surrounding the petitioners' objection is whether or not the special master properly applied section 300aa–14 regarding the determination of an on-table HHE.

According to the Vaccine Act:

> (1) Compensation shall be awarded under the Program to a petitioner if the special master or court finds on the record as a whole—
>
> > (a) that the petitioner has demonstrated by a preponderance of the evidence the matters required in the petition by section 300aa–11(c)(1) of this title, and

> (B) that there is not a preponderance of the evidence that the illness, disability, injury, condition, or death described in the petition is due to factors unrelated to the administration of the vaccine described in the petition.

The special master or court may not make such a finding based on the claims of a petitioner alone, unsubstantiated by medical records or by medical opinion.

42 U.S.C. 300aa–13(a)(1). Thus, a petitioner must show, by a preponderance of the evidence, either that a table injury was sustained or that the vaccine, in fact, caused the injury. 42 U.S.C. 300aa–11(c)(1).

To demonstrate a table injury, a petitioner must show that the individual who was given the vaccination suffered an injury listed on the table within the table's prescribed time periods. 42 U.S.C. 300aa–14. Thus, if a petitioner can show, by a preponderance of the evidence, that a table injury was sustained within the required time period, then there is a presumption that the petitioner is entitled to compensation, unless the respondent can show, by a preponderance of the evidence, that the injury was caused by factors unrelated to the administration of the vaccine.

## A. HHE.

In order for the petitioners to recover for Jason's death based on the onset of an HHE, they are required to establish, by a preponderance of the evidence, that: (1) within seventy-two hours of receiving his DPT vaccination, Jason suffered the onset of HHE, *see* 42 U.S.C. 300aa–14(a)(I)(C); and (2) Jason's death was a sequela[6] of the HHE, *see* 42 U.S.C. 300aa–14(a)(I)(E). The Federal Circuit stated these requirements as follows:

> In the case of a Table claim based upon death following a DTP vaccination, Congress has made its intent very clear. In order for a petitioner to recover for a

---

**6.** A sequela is " 'any lesion or affection following or caused by an attack of disease,' Dorland's Illustrated Medical Dictionary 1509 (27th ed.1988), or a 'condition following as a consequence of a disease,' Stedman's Medical Dictionary 1407 (25th ed.1990)." *Hossack*, 32 Fed. Cl. at 774; *see also Abbott v. Secretary of the Dep't of* *Health & Human Servs.*, 27 Fed. Cl. 792, 794 (1993), *aff'd in part, rev'd in part*, 19 F.3d 39 (Fed.Cir.1994). In addition, sequela has been defined as "[a]ny abnormal condition which follows a disease and is the result of it." 4 SCHMIDT'S ATTORNEY's DICTIONARY OF MEDICINE S–86 (1995).

death which follows a DTP vaccination, based on a Table claim, two things must be established by a preponderance of the evidence. *First,* the petitioner must show that one of the four injuries or conditions listed in the Table occurred within the time period specified in the Table for that injury or condition. *Second,* the petitioner must show that death occurred as a sequela of that injury or condition. That these two requirements must be met is demonstrated by the way in which the part of the Table which covers DTP vaccinations is structured. * * *

[T]he Table first lists, in paragraphs A through D, four injuries or conditions and for each such injury or condition, a time period for first onset or manifestation of such injury or condition. *See* 42 U.S.C. 300aa–14(a)I. Then, the Table establishes in paragraph E that there also may be recovery under the Program for "[a]ny acute complication or sequela (including death) of an illness, disability, injury, or condition referred to above which illness, disability, injury, or condition arose within the time period prescribed." Id. The arrangement of the words in paragraph E renders the meaning of the paragraph clear. Recovery for a death following a DTP vaccination based on a Table claim is conditioned upon the death being a sequela of an illness or condition listed in paragraph A, B, C, or D "which arose within the time period prescribed" in the Table for that illness or condition.

*Hellebrand,* 999 F.2d at 1569–70. Therefore, for the purposes of the present action, a finding that Jason's death was the sequela of the onset of the on-table HHE must occur *after* a petitioner has proven, by a preponderance of the evidence, that there was an ontable injury. *Frank v. Secretary of the Dep't of Health & Human Servs.,* 34 Fed. Cl. 29, 37–38 (1995); *Abbott,* 27 Fed. Cl. at 793; *Allen v. Secretary of Dep't of Health & Human Servs.,* 24 Cl.Ct. 295, 296 (1991).

In their Motion for Review, the petitioners contend that they proved, by a preponderance of the evidence, that Jason suffered an HHE within the statutory time period. According to the petitioners, the symptoms relied on by the special master—fussiness, eating less, responsive to being picked up, and smiling—in denying compensation were not the bases for their petition. In other words, the petitioners did not claim that Jason experienced an on-table HHE prior to Ms. Ricks finding him unconscious on the water bed. Instead, the petitioners argue in their petition that they relied on those symptoms exhibited by Jason *after* he was found by Ms. Ricks on the water bed. *See* Pets.' Mot. for Rev. at 8. This Court agrees that the petitioners do not contend that Jason experienced an on-table HHE *prior* to Ms. Ricks finding him on the water bed, and, as this Court finds for the purpose of proving, by a preponderance of the evidence, an on-table injury within the table period, Jason could not and did not experience an on-table HHE *before* Ms. Ricks found him unconscious on the water bed. In addition, this Court finds that the petitioners did not prove, by a preponderance of the evidence, that Jason suffered an HHE *after* he was found unconscious on the water bed.

The Vaccine Act describes an HHE as follows:

A shock-collapse or a hypotonic-hyporesponsive collapse may be evidenced by indicia of symptoms such as decrease or loss of muscle tone, paralysis (partial or complete), hemiplegia or hemiparesis, loss of color or turning pale white or blue, unresponsiveness to environmental stimuli, depression of consciousness, loss of consciousness, prolonged sleeping with difficulty arousing, or cardiovascular or respiratory arrest.

42 U.S.C. 300aa–14(b)(1). In addition, in the respondent's expert report, Dr. Guggenheim outlined what is usually present during an HHE:

A hypotonic hyporesponsive episode (HUE) in an infant (also sometimes called shock-collapse) is a dramatic event characterized by lack of responsiveness (to the point of an unconscious state), pallor, hypotonia,[7] and, often, fever. It usually occurs

---

7. Hypotonia has been described as "[a] condition in which there is a diminution or loss of muscu-

within 12 hours after an immunization. No such event is described in the mother's testimony.

Report of Dr. Guggenheim at 2.[8]

Moreover, several decisions of this Court describe the symptoms present during an HHE. *See Hossack*, 32 Fed. Cl. at 771 (affirming special master's finding of an on-table HHE where child was lethargic, limp, and lacked interest in food or attention after DPT vaccination); *Zinko v. Secretary of the Dep't of Health & Human Servs.*, 24 Cl.Ct. 430, 431 (1991) (affirming special master's finding of an on-table HHE where child was limp and lifeless, had a dazed appearance, failed to recognize family members or surroundings, was lethargic, slept for four to eight hours at a time, and was not easily aroused when awakened for feedings); *Allen*, 24 Cl.Ct. at 296 (affirming special master's finding of an on-table HHE due to child's fever, unusual sleep patterns, unresponsiveness, and lack of muscle tone after DPT vaccination); *Morris v. Secretary of the Dep't of Health & Human Servs.*, 20 Cl.Ct. 14, 18–19 (1990) (affirming special master's finding of an on-table HHE where child who was previously administered DPT vaccination was pale, very drowsy, and could not be aroused); *Bell v. Secretary of the Dep't of Health & Human Servs.*, 18 Cl.Ct. 751, 757 (1989) (affirming special master's finding of an on-table HHE where child had a depression of consciousness, refused to eat, was listless and limp, and unresponsive to stimuli after DPT vaccination); *Rochester v. United States*, 18 Cl.Ct. 379, 385 (1989) (affirming special master's finding of an on-table HHE where child had loss of muscle tone, was unresponsive to environment, lost skin color and appeared

pale, and autopsy found evidence of pulmonary edema and congestion after DPT vaccination).

■ In this case, the evidence demonstrates that after his vaccination, Jason was fussy but appeared to calm down when he was picked up, lacked interest in food but eventually ate, only slept for five to ten minutes at a time, and smiled at least once when he was left with the babysitter, Ms. Ricks. While this Court has found, on at least two occasions, an on-table HHE based, in part, on the child's lack of interest in food or refusal to eat, *see Hossack*, 32 Fed. Cl. at 771; *Bell*, 18 Cl.Ct. at 757, the petitioner places too much weight on that individual symptom. The fact that Jason may have exhibited one or more of the symptoms of an HHE does not demonstrate that Jason experienced an on-table HHE by a preponderance of the evidence. *See Raspberry v. Secretary of the Dep't of Health & Human Servs.*, 33 Fed. Cl. 420, 423 (1995).

There are no other symptoms described in the Vaccine Act or the case law that are the same as, or similar to, those symptoms exhibited by Jason after his vaccination. Specifically, during August 30 and 31, Jason was not unresponsive to environmental stimuli. To the contrary, he responded almost immediately when he was picked up by his mother or Ms. Ricks and stopped crying or fussing. In addition, there is no evidence that Jason lost muscle tone or appeared limp during the time period at issue. Also, Jason never exhibited a fever. Moreover, Jason was not lethargic, did not sleep for long periods of time, and was never to the point of being unconscious.[9] To the contrary, Jason only

---

lar tonicity, in consequence of which the muscles may be stretched beyond their normal limits." STEDMAN'S MEDICAL DICTIONARY 755 (25th ed.1990).

8. The petitioners contend that the special master erroneously credited "Dr. Guggenheim's opinion that HHE's occur within 12 hours." Pets.' Mot. for Rev. at 12. This Court agrees with the respondent that the petitioners' contention is unsupported by the record. The special master simply credited Dr. Guggenheim's opinion over Dr. Geier's opinion regarding the finding of an on-table HHE and that Jason did not experience an on-table HHE within the seventy-two-hour

time period. *See* Dec. at 11, 13. There is no evidence that the special master applied a time period other than that set forth in the Vaccine Act.

Moreover, the petitioners contend that Dr. Guggenheim agrees with Dr. Geier that Jason experienced HHE symptoms while he was alive. This Court rejects that contention, however, as clearly contrary to Dr. Guggenheim's opinions in her written report. *See* Report of Dr. Guggenheim at 3–4.

9. Of course, this Court does agree that the facts show that Jason was unconscious when Ms. Ricks found him on the water bed not breathing.

slept for periods of five to ten minutes at a time. Finally, Jason did not appear to be pale or blue.[10] Despite testimony of Mrs. Meckle that Jason had appeared to be bloated during the evening after his vaccinations, contemporaneous medical records do not indicate any such symptoms. *See Grant v. Secretary of the Dep't of Health & Human Servs.*, 956 F.2d 1144, 1147 (Fed.Cir.1992). Based on the evidence, or the lack thereof, of HHE symptoms, this Court finds that the special master's decision that Jason did not suffer the onset of an HHE after his DPT vaccination and *before* he was found unconscious on the water bed was not arbitrary, capricious, or an error of law. *See id; Raspberry*, 33 Fed. Cl. at 423.

Next, in their Motion for Review, the petitioners contend that the special master erroneously ruled that Jason's onset of HHE had to precede the agonal event (*i.e.*, his death). According to the petitioners, tis was an error because it reduced the seventy-two-hour time period available to the petitioners to establish an on-table HHE under the Act. The respondent contends in response that the petitioners misunderstand the law, which, in fact, does require that the onset of a table injury, including HHE, precede death. As set forth below, this Court rejects the petitioners' argument.

A petitioner must prove, by a preponderance of the evidence, that death was the sequela of the HHE. To meet this burden,

> a petitioner must show that a sequela is caused by a Table injury. This Court finds, along the lines of *Song* [, 31 Fed. Cl. at 65] and *Allen* [, 24 Cl.Ct. at 295], that a preponderance of the evidence must show that some logical, direct causal link exists between the presumed Table injury and the alleged sequela. This is not a difficult burden and requires less than medical certainty. Yet, * * * [a petitioner] must present some evidence, such as expert testimony, fact testimony, or documentation, to convince the special master that, more

likely than not, * * * death was connected to the HHE/shock collapse * * *

*Hossack,* 32 Fed. Cl. at 776.

This Court agrees with the respondent that, in order for the petitioners to recover, Jason's on-table HHE must have preceded his death. Recently, the Federal Circuit articulated the controlling rule for determining when death is the sequela of an on-table HHE and, thus, compensable under the Vaccine Act:

> Clearly an HHC or death *following* HHC is compensable * * * * * * Thus, death alone is not compensable if a table injury has not been established, regardless of the interval between vaccination and death. *Symptoms which are consistent with HHC but are also part of death do not on these facts establish an HHC that is a table injury.*

*Hodges,* 9 F.3d at 960 (emphasis added).

In contending that Jason suffered the onset of an HHE before his death and then died, both of which the petitioners contend were caused by the DPT vaccination, the petitioners rely on Dr. Geier's opinion that during the paramedics' attempts to resuscitate Jason, Jason was not yet dead and was, at that time, experiencing on-table HHE symptoms, which were compensable because they occurred before death. According to Dr. Geier, Jason

> probably did have a ventricular fibrillation electrical pattern from his heart during resuscitation attempts. *This means that this child was not dead at the time during which resuscitation was being attempted. Therefore, during this time period it is indisputable that this child had various symptoms that fit Vaccine Compensation Act under the heading of HHE including loss of consciousness. turning pale or blue, lessening of awareness of the environment, etc.* My understanding is that a child whose [sic] is undergoing resuscitation and has ventricular fibrillation is not legally dead until the team stops the resuscitation,

---

However, as established, *infra* at 22–24, *Hodges,* 9 F.3d at 960, prevents the finding of an on-table HHE based on symptoms that are a part of the dying process.

10. Ms. Ricks testified that Jason appeared to be pale and white when she found him unconscious on the water bed. However, see *supra,* note 9.

and until he is pronounced dead. Therefore, I think that virtually all of the signs and symptoms described under the Vaccine Compensation Table, clearly were observed in this child when he was not dead. Supp. Aff. of Dr. Geier at 9–10 (emphasis added).

 However, the special master rejected Dr. Geier's opinion and found Dr. Guggenheim's opinion more credible. The special master has broad discretion in determining the credibility of the expert witnesses whose testimony was taken. *Bradley v. Secretary of the Dep't of Health & Human Servs.*, 991 F.2d 1570, 1575 (Fed.Cir.1993); *Hellenbrand–Sztaba v. Secretary of Health & Human Servs.*, 35 Fed. Cl. 222, 224–25 (1996), *aff'd*, 106 F.3d 426 (Fed.Cir.1997); *Raspberry*, 33 Fed. Cl. at 423. Because the special master considered the facts and circumstances surrounding the witnesses' testimony and opinions. this Court cannot find that the rejection of Dr. Geier's opinion, as to the cause of Jason's death, was arbitrary and capricious. *See id.*

 Even if this Court could disregard the special master's credibility determinations, the Court finds that the petitioners' argument does not meet the standard for finding the sequela of an on-table injury as set forth in *Hodges.* According to Dr. Geier, during the time that the paramedics were attempting to resuscitate Jason, he had several of the symptoms associated with HHE, including "loss of consciousness, turning pale or blue, lessening of awareness of the environment, etc." Supp. Aff. of Dr. Geier at 9.[11] Based on Dr. Geier's opinion regarding Jason's symptoms, the petitioners argue that Jason's HHE is compensable simply because the symptoms occurred prior to his death. Pets.' Mot. for Rev. at 9–10. However, that is not the test. Contrary to the petitioners' contention, it is "relevant when Jason exhibited the HUE symptoms." *Id.* at 10. HUE

symptoms that occur as part of the dying process do not constitute symptoms of an on-table HHE under the Vaccine Act. *See Hodges*, 9 F.3d at 960. While this Court agrees that Jason's symptoms are consistent with HUE, as it is defined in section 300aa–14(b)(1), under the facts of this case they were also a part of the dying process at the time that the paramedics were attempting, unsuccessfully, to revive him. Jason's HHE symptoms do not independently establish an on-table HUE that resulted in his death. *See Hodges*, 9 F.3d at 960; *Hellebrand*, 999 F.2d at 1570–71. As a result, the petitioners did not prove, by a preponderance of the evidence, that Jason experienced an on-table HHE (independent of death) as a result of the DPT vaccination and that his death was caused by, or connected to, the HHE. *See id.* Therefore, the special master's application of the Vaccine Act and *Hodges* to the present facts was not arbitrary, capricious, or an error of law.

**B. Factors Unrelated to the Administration of the Vaccine.**

Finally, in their Motion for Review, the petitioners contend that the respondent has offered no evidence that Jason's death was caused by factors unrelated to the administration of the August 30, 1991 DPT vaccine because SIDS is not a determined or determinable cause of death. In response, the respondent counters that the burden of proof to demonstrate an unrelated factor did not shift to it because the petitioners failed to meet their initial burden that Jason suffered a table injury.

After a petitioner has met its prima facie case of an on-table injury under the Act, the Government can rebut that presumption of a vaccine-related injury by demonstrating, by a preponderance of the evidence, that the illness, disability, injury, condition, or death was caused by factors unrelated to the ad-

---

11. In their Motion for Review, the petitioners contend that the special master ignored Jason's symptoms *after* he was found unconscious on the water bed and "swept aside these symptoms as irrelevant," which was an error of law. *See* Pets.' Mot. for Rev. at 11. This Court, however, finds that the special master specifically addressed these symptoms and Dr. Geier's opinion

relating to them. The special master rejected Dr. Geier's opinion that Jason was alive when resuscitation attempts were being made and correctly found that, under *Hodges*, 9 F.3d at 960, Jason's HHE symptoms could not independently establish an on-table HHE prior to his death because they occurred during the dying process. *See* Dec. at 10.

ministration of the vaccine. 42 U.S.C. 300aa–13(a)(1)(B); *see also Cucuras v. Secretary of the Dep't of Health & Human Servs.*, 993 F.2d 1525, 1528 (Fed.Cir.1993) (finding that burden shifts to the respondent to demonstrate an alternative cause only after the presumption of a vaccine-related injury is proven by the petitioner); *Bradley*, 991 F.2d at 1575 (finding that section 300aa–13(a)(1)(B) does not apply until a petitioner has demonstrated a table injury by a preponderance of the evidence).

Moreover:

(2) For purposes of paragraph (1), the term "factors unrelated to the administration of the vaccine"—

(a) does not include any idiopathic, unexplained, unknown, hypothetical, or undocumentable cause, factor, injury, illness, or condition, and

(B) may, as documented by the petitioner's evidence or other material in the record, include infection, toxins, trauma (including birth trauma and related anoxia), or metabolic disturbances which have no known relation to the vaccine involved, but which in the particular case are shown to have been the agent or agents principally responsible for causing the petitioner's illness, disability, injury, condition, or death.

42 U.S.C. 300aa–13(a)(2).

SIDS is the "sudden and unexpected death of an apparently healthy infant, typically occurring between the ages of three and five months and not explained by careful post-mortem studies." *Hellebrand*, 999 F.2d at 1566 n. 2 (quoting DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1644–45 (27th ed.1988)). This Court has found that SIDS cannot be a factor unrelated to the administration of the vaccine for the purpose of rebutting a petitioner's prima facie case of an on-table injury because SIDS, by definition, is the absence of an identifiable cause of death and, therefore, is an idiopathic or unexplained cause under section 300aa–13(a)(2)(A) of the Vaccine Act. *See Hossack*, 32 Fed. Cl. at 771 n. 4; *Morris*, 20 Cl.Ct. at 22 n. 7; *Monteverdi v. Secretary of the Dep't of Health & Human Servs.*, 19 Cl. Ct. 409, 413 (1990); *Greene v. Secretary of the Dep't of Health & Human Servs.*, 19 Cl.Ct. 57, 63 (1989); *Bell*, 18 Cl.Ct. at 759 n. 11 (1989). Therefore, this Court is prohibited from denying compensation to the petitioners on the basis that SIDS was an alternative cause to Jason's injuries and death. *See Rochester*, 18 Cl. Ct. at 386.

However, sections 300aa–13(a)(1)(B) and 300aa–13(a)(2)(A) do not apply in this case because, as the special master and this Court found, the petitioners have failed to prove that Jason suffered an on-table HHE by a preponderance of the evidence. *See Hellenbrand–Sztaba*, 35 Fed. Cl. at 225; *Frank*, 34 Fed. Cl. at 38. The burden of proving that Jason's injuries and death were the result of factors unrelated to the administration of the vaccine never shifted to the respondent. Therefore, the petitioners' argument that the respondent failed to prove that Jason's death was caused by factors unrelated to the DPT vaccination is without merit.

### CONCLUSION

For the foregoing reasons, this Court denies the petitioners' Motion for Review and affirms the January 31, 1997 Decision of the special master. The clerk of the Court is directed to enter judgment accordingly.

Each party is to bear its own costs.